WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Stephen Karotkin
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                        :

**In re**                            :     **Chapter 11**
                        :

**TOPS HOLDING II CORPORATION**, *et al.*,  :     **Case No. [_____] (RDD)**
                        :

**Debtors.[1]**                   :     **(Joint Administration Pending)**
                        :
------------------------------------------------------------ x

**DECLARATION OF MICHAEL BUENZOW**
**PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY**
**RULES FOR THE SOUTHERN DISTRICT OF NEW YORK**

I, Michael Buenzow, make this declaration under 28 U.S.C. § 1746:

1.      I am a Senior Managing Director with FTI Consulting, Inc. ("**FTI**") and

the Vice Chairman of FTI's Restructuring group. I have more than 25 years of financial

restructuring, interim management, turnaround, and management consulting experience. I have

been involved in all aspects of the reorganization process, including the development and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Tops Holding II Corporation (3709), Tops MBO Corporation (4249), Tops Holding LLC (2536), Tops Markets, LLC (2810), Tops Markets II Corporation (6401), Tops PT, LLC (2050), Tops Gift Card Company, LLC (6105), Erie Logistics LLC (9381), and TM1, LLC (2409).

evaluation of strategic business plans, the implementation of liquidity management strategies, and advising on numerous in and out-of-court restructurings, including chapter 11 proceedings.

2.     On December 22, 2017, FTI was retained, through Weil, Gotshal & Manges LLP ("**Weil**") on behalf of Tops Holding II Corporation ("**Holdings**" and its affiliates, collectively, "**Tops**" or the "**Company**"), to assist Weil in advising the Company in its negotiations with creditors and to provide the Company and its other professionals financial advisory services in connection with the Company's evaluation and development of strategic alternatives to address its capital structure.

3.     Immediately prior to the Commencement Date (as defined herein), I was appointed Chief Restructuring Officer ("**CRO**") of Holdings and its affiliated debtors and debtors in possession in connection with the contemplated commencement of the above-captioned chapter 11 cases (collectively, the "**Debtors**").  As CRO, I report and provide strategic business advice to the Company's Board of Directors and Chief Executive Officer in connection with the Debtors' chapter 11 cases, and I am responsible for carrying out the Debtors' chapter 11 strategy and objectives described herein.

4.     On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this court (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases (the "**Chapter 11 Cases**").

5.     Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' legal and financial advisors, or my opinion based upon

my experience, knowledge, and information concerning the Debtors' operations and the supermarket industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.        This Declaration is submitted pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") for the purpose of apprising the Court and parties in interest of the circumstances that compelled the commencement of these Chapter 11 Cases and in support of the motions and applications that the Debtors have filed with the Court, including the "first-day motions" (the "**First-Day Pleadings**"). I am authorized to submit this Declaration on behalf of the Debtors.

7.        Section I provides an overview of the Debtors and these Chapter 11 Cases. Section II describes the Debtors' businesses. Section III describes the circumstances that compelled the commencement of the Chapter 11 Cases. Section IV describes the Debtors' corporate and capital structure. Section V provides a summary of the First Day Pleadings and factual bases for the relief requested therein. Section VI identifies the attached schedules of information required by Local Rule 1007-2.

## I.        Overview[2]

8.        Tops is a leading supermarket retailer with 169 owned supermarkets, and five franchised stores, in Upstate New York, Northern Pennsylvania, and Vermont. The Tops brand is widely recognized as a strong retail supermarket brand name, supported by strong customer loyalty and attractive supermarket locations. Tops has approximately 14,000 employees, over 12,300 of whom are represented by unions (including approximately 11,600 store associates represented by United Food and Commercial Workers International Union

---

[2] Capitalized terms used but not defined in this overview section shall have the meanings assigned to them below.

WEIL:\96457936\1\77738.0003

("**UFCW**") District Union Local One ("**Local One**"), and approximately 700 employees at Tops' warehouses who are represented by the International Brotherhood of Teamsters Local 264 (the "**Teamsters Local**").  In addition, approximately 1,000 employees work at the Debtors' five (5) franchised store locations.  The Company's UFCW employees are subject to twelve (12) collective bargaining agreements (each, a "**CBA**"), and the Company's CBAs with the Teamsters Local expired in August 2017.  In late 2013, certain members of the Company's management team purchased the equity interests in Tops – as such, Tops is currently owned by eleven (11) members of its management team.

9.      As of December 30, 2017, the Company's unaudited financial statements reflected total assets of approximately $977 million and total liabilities of approximately $1,176 million.[3]  The following graphic depicts the Company's prepetition organizational structure:

---

[3] Financial results are unaudited, preliminary and subject to change, and do not reflect additional potential asset impairment charges.

WEIL:\96457936\1\77738.0003



## Tops Corporate Structure
### (with Debt)

10.    The Debtors have commenced these Chapter 11 Cases to implement a comprehensive financial restructuring with three (3) core objectives: (i) deleveraging the Company's balance sheet; (ii) ensuring that the Company's leases and supply agreements provide the best available terms; and (iii) constructively engaging with the UFCW and the Teamsters Local to ensure that the Debtors' enterprise is viable in the long term.  In recognition of their duties to maximize value, the Debtors, in consultation with their advisors, elected to

5

commence these chapter 11 cases to pursue these objectives with the benefits of the tools available to them under the Bankruptcy Code.

11.     The Debtors intend to move swiftly through their chapter 11 cases and address these issues in a focused and constructive manner without disruption to their operations. Indeed, the Debtors intend to remain in chapter 11 for approximately six (6) months.  The Debtors intend to spend the first three (3) months of these cases negotiating a consensual restructuring with their creditor constituencies, which will be memorialized in a plan of reorganization (the "**Plan**").  The Company intends to utilize the latter three (3) months to prosecute and confirm the Plan.  The Debtors, however, are prepared to extend this timeframe if necessary to achieve their restructuring objectives.

12.     In advance of the chapter 11 filing, the Debtors commenced negotiations with their major stakeholders, including an ad hoc committee (the "**Ad Hoc Noteholder Committee**") of creditors collectively holding more than 70% of the Company's senior secured notes, regarding a consensual deleveraging transaction.  In support of the Debtors' chapter 11 filing, the Ad Hoc Noteholder Committee has committed to provide the Company with a $125 million debtor-in-possession term loan facility (the "**DIP Term Loan**"), and the ABL Lenders agreed to provide the Company borrowing availability through a $140 million postpetition asset based revolver (the "**DIP ABL Facility**") to support the Debtors' liquidity during the chapter 11 cases.  As described in the DIP Motion, upon entry of the interim DIP Order, all of the Debtors' Prepetition ABL Obligations (other than the Prepetition ABL FILO Loan) shall be refinanced with the DIP ABL Obligations. The proceeds of the DIP Term Loan will be used to (i) repay the Prepetition ABL FILO Loan and (ii) reduce the Company's obligations under the DIP ABL Facility in accordance with the terms of the DIP Order and the DIP Documents.

6

13.     In addition, the Company has reached an interim agreement with its primary unsecured creditor, C&S Wholesale Grocers, Inc. ("**C&S**"), who procures approximately 66% of the Company's for-resale goods.  Pursuant to the interim arrangement, C&S will provide the Debtors an additional week of trade terms, which will further enhance the Debtors' available liquidity to satisfy their obligations during the chapter 11 cases in the ordinary course.  In exchange, the Debtors have agreed, among other things, to pay C&S a portion of its prepetition claim (which is entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code) upon entry of an order approving the interim arrangement with C&S.

14.     In sum, the Company will have more than sufficient liquidity to fund its operations through the pendency of these chapter 11 cases and expects operations to continue in the normal course throughout the Chapter 11 Cases.

## A.     Balance Sheet Deleveraging.

15.     Despite the significant headwinds facing the grocery industry, over the past five years, the Company has experienced solid financial performance and has sustained stable market share.  The vast majority of the Company's supermarkets generate positive EBITDA and the Company generates strong operating cash flows.  Transactions undertaken by previous private equity ownership, however, saddled the Company with an unsustainable amount of debt on its balance sheet.  Specifically, the Company currently has approximately $715 million of prepetition funded indebtedness, including $560 million of senior secured notes due 2022 and an asset based revolving credit facility from Bank of America, N.A. ("**Bank of America**") with $68 million outstanding, plus approximately $34 million of letters of credit and a $10 million first-in last-out term loan, for a total outstanding amount due Bank of America of approximately $112 million.  As stated, the Company intends to restructure its balance sheet through a deleveraging transaction and has been in negotiations with the Ad Hoc Noteholder

7

Committee regarding the same. The DIP Term Loan requires the Company to enter into a restructuring support agreement with the Ad Hoc Noteholder Committee within 75 days of the Commencement Date.

**B.    Resolution of Labor Issues.**

16.    In the period leading up to the commencement of these Chapter 11 Cases, the Company has faced various labor-related challenges. As discussed further in Section III, the Company has been embroiled in a protracted and costly arbitration with the Teamsters Pension Fund concerning a withdrawal liability of in excess of $180 million allegedly arising from the Company's acquisition of Debtor Erie Logistics LLC ("**Erie Logistics**") from C&S Wholesale Grocers, Inc. ("**C&S**") in December 2013. Tops has indemnified C&S for the claims alleged in the arbitration. The arbitration has been pending for more than four years, during which time Tops has remitted, consistent with ERISA § 4219's "pay now, dispute later" scheme, approximately $27.6 million toward the alleged Withdrawal Liability. The payments were made directly to, and remain with, the Teamsters Pension Fund. In addition, through May 2017, the Company has tendered approximately $16.3 million in regular monthly pension contributions to the Teamsters Pension Fund, all of which – except for approximately $500,000 – have been rejected and returned by the Fund. Arbitration hearings have been completed, and briefing is scheduled to be completed by March 30, 2018. A mediation is scheduled for the first week in May 2018. Additionally, the Company's pension plans with the UFCW and the Teamsters Local are currently significantly underfunded, including by approximately $393 million with respect to the UFCW. Utilizing the tools available to it under the Bankruptcy Code, the Company will endeavor to resolve all issues relating to the Teamsters Arbitration and address its pension obligations, and the Company will take reasonable steps to do so on a consensual basis.

WEIL:\96457936\1\77738.0003

### C.    Supply and Lease Terms Improvement.

17.    Approximately 66% of the Company's for-resale products are procured by C&S pursuant to the C&S Agreements (as defined herein).  Pursuant to the 2013 Supply Agreement, C&S purchases inventory on the Debtors' behalf and the purchased inventory is stored at the WNY Warehouses.  The Company takes ownership of the inventory once it leaves the WNY Warehouses.  The Company, through the services of its own employees, self-distributes the inventory procured by C&S, transporting the inventory by truck to the Company's stores.  The Company will explore opportunities to improve the terms of its supply agreements. In addition, Hilco Real Estate, LLC was retained by Weil, on behalf of the Company, to help the Company evaluate and pursue improvements of its lease terms.

## II.    The Debtors' Businesses

### A.    History and Formation

18.    The Company's history traces back to the early 1920s when Ferrante Castellani moved from a village outside of Rome, Italy to Niagara Falls, New York, where he opened his first grocery store.  Ferrante's sons, Armand and Alfred, eventually took over the business and opened two more stores under the name Great Bear Market.  In the 1950s, Armand partnered with Thomas Buscaglia, owner of T.A. Buscaglia Equipment Company, as well as with a group of independent Bells store owners, to expand their grocery enterprise.  In 1962, the newly-formed group opened its first true modern supermarket, a 25,000 square-foot store in Niagara Falls, New York.  That same year, the team chose to name their enterprise "Tops."  Tops expanded throughout the 1970s, increasing its footprint in Western New York and expanding into the Rochester area.  During this period of expansion, Tops also opened its first Pennsylvania location in Bradford, PA.

WEIL:\96457936\1\77738.0003

19.     In 1991, Koninklijke Ahold N.V. ("**Ahold**"), a Dutch international food retailer, acquired Tops.  In 2001, Tops formed an alliance with Giant Food stores, a sister Ahold company, based in Carlisle, Pennsylvania.  The Tops-Giant Food alliance operated until 2007, when Ahold sold Tops (the "**Morgan Stanley Purchase**") to Morgan Stanley Private Equity and certain other private equity firms (the "**Morgan Stanley Group**").[4]  Ahold continues to guarantee 47 of the Company's store leases.  In 2010, under the Morgan Stanley Group's ownership, Tops acquired various assets from The Penn Traffic Company ("**Penn Traffic**"), thereby increasing its footprint by 79 stores (the "**Penn Traffic Acquisition**").[5]  In September and October 2012, Tops purchased 21 stores (the "**GU Stores**") owned by the Grand Union Family Markets ("**GU Markets**").

20.     In late 2013, Holdings, the Morgan Stanley Group, various other stockholders of Holding II, and Tops MBO Corporation ("**Tops MBO**") executed a Purchase and Sale Agreement pursuant to which Tops MBO agreed to purchase substantially all of the common stock of Holding II (the "**Management Purchase**").  At the time of the Management Purchase, Tops MBO was substantially owned and controlled by six (6) members of the Company's then-senior management team (together, the "**Management Team**").[6]  Currently, eleven (11) individuals, including five (5) members of the Debtors' senior management, collectively own all of the outstanding shares of Tops MBO.

### B.     The Debtors' Current Business Operations

---

[4] After the Morgan Stanley Purchase, certain members of management owned a small percentage of the equity interests in Tops.

[5] The Company ultimately retained only 50 of the stores purchased in the Penn Traffic Acquisition.  The remainder were closed or sold.

[6] A small number of the Company's employees also held shares in Tops MBO at that time.

WEIL:\96457936\1\77738.0003

21.     The Debtors operate 169 full-service supermarkets, 168 under the Tops trade name, or "banner**,**" and one under the Orchard Fresh banner (the "**Orchard Fresh Store**"). An additional five (5) supermarkets are operated by franchisees under the Tops banner (the "**Franchise Stores**").  The Debtors' corporate headquarters are in Williamsville, New York.

22.     Tops supermarkets offer grocery, produce, frozen, dairy, meat, floral, seafood, health and beauty care, general merchandise, deli, prepared foods and bakery goods.  As of the date hereof, 54 supermarkets offer pharmacy services, 58 supermarkets have onsite or nearby fuel stations,[7] and 44 supermarkets have in-store banks.  The Orchard Fresh Store, which the Company opened in 2013, sells a unique combination of specialty, upscale and gourmet foods, with a focus on natural and organic products, a strong emphasis on the health-conscious consumer, and food items sourced both locally and globally.   Unlike many other grocers struggling in the current retail environment, all but approximately twenty-one (21) of the Debtors' stores are currently generating positive EBITDA.

23.     With the exception of eight (8) stores that the Company owns, the Company leases all of its store properties from various landlords.  The Company pays approximately $6 million per month in rent on its leased real property, exclusive of real property taxes, common area maintenance, and insurance.

24.     Substantially all of the Company's supermarkets are either freestanding or located in small neighborhood shopping centers. The Debtors believe that their supermarkets are strategically positioned and clustered in an efficient and targeted manner, focusing on key regions in Upstate New York, Northern Pennsylvania and Vermont.  The sizes of the Debtors'

---

[7] Forty-three (43) of the fuel stations are corporate-owned fuel locations, while fifteen (15) are owned by a third party and operated under the Tops banner, for which the Company receives commission income.

supermarkets are tailored to the specific needs of the local communities in which the Company operates. Specifically, the Company operates four (4) distinct store formats to effectively reach its customer base: (i) "super centers," which are located in densely populated areas and offer full service amenities, including deli, seafood and meat counters, pharmacy, banking and fuel; (ii) "country stores," which are located in more rural areas and provide a customized mixture of full service departments and products; (iii) "neighborhood small stores," which are located in smaller, suburban communities and whose individual services depend on neighborhood variables; and (iv) "urban area conventional stores," which are located in urban or inner city areas and generally offer fewer full service amenities than the other store formats. The majority of the Debtors' supermarkets are open 24 hours a day, 7 days a week. The following graphic depicts the Company's four store formats:



25.    Approximately 66% of the Company's for-resale products are procured by C&S. Prior to 2013, the Company also contracted with C&S for warehouse and distribution services for all of its stores, including the non-GU stores. C&S supplied the Company's

WEIL:\96457936\1\77738.0003

supermarkets with grocery and perishable products through a distribution center in Lancaster, New York (the "**Lancaster Warehouse**") and a frozen goods facility in Cheektowaga, New York (the "**Cheektowaga Facility**" and, together with the Lancaster Warehouse, the "**WNY Warehouses**"). Beginning in 2010, however, the Company conducted an in-depth analysis and study of the potential benefits and cost savings associated with engaging in self-distribution. The Company concluded that it would realize significant cost savings by engaging in self-distribution. Consequently, in December 2013, Debtor Tops Markets, LLC ("**Tops Markets**") acquired the operations of the WNY Warehouses and certain related assets (although not the Lancaster Warehouse itself, which had been owned by Tops Markets) from C&S (the "**Erie Transaction**") pursuant to that certain Asset Purchase Agreement between C&S and Tops Markets, LLC, dated as of December 22, 2013 (the "**Erie APA**").

26. In connection with the Erie Transaction, the Company modified its existing supply agreement with C&S and entered into that certain Amended and Restated Supply Agreement, dated December 22, 2013, between Tops Markets and C&S (as amended, the "**2013 Supply Agreement**"). As of April 1, 2015, Tops Markets and C&S agreed in principle to amend certain operating terms and extend the term of the 2013 Supply Agreement through April 1, 2020. Pursuant to the 2013 Supply Agreement, C&S continues to provide procurement and purchasing services to the Company, but the Company has assumed transportation and distribution functions for the Lancaster Warehouse. In addition, in August 2016, the Company expanded its ability to warehouse and distribute frozen goods to its supermarkets, by moving out of the Cheektowaga Facility and into a freezer facility in West Seneca, New York (the "**West Seneca Facility**").

13

27.    As discussed above, in September and October 2012, the Company acquired the GU Stores. Pursuant to that certain Supply Agreement, dated as of September 24, 2012 (the "**GU Supply Agreement**" and together with the 2013 Supply Agreement, the "**C&S Agreements**"), C&S provides warehousing, transportation, procurement and purchasing services for the GU Stores.

### C.    The Company's Employees.

28.    The Debtors currently employ approximately 14,000 employees, primarily store associates (the "**Associates**").[8]    Approximately 80% of the Associates are members of UFCW Local One, or six (6) other UFCW unions. The Company is a party to five (5) CBAs with Local One, which are set to expire between October 2018 and July 2020. The Company also is a party to seven (7) other non-Local One UFCW collective bargaining agreements, which are set to expire between now and February 2024.

29.    Approximately 5% of the Associates are members of the Teamsters Local. The Teamsters Local represents the non-supervisory warehouse and driver personnel employed by Erie Logistics at the WNY Warehouses. Prior to their expiration, the Company was party to three (3) CBAs with the Teamsters Local (collectively, the "**Teamsters CBAs**"). As further discussed below, the NLRB recently determined that the Teamsters CBAs expired in August 2017. As such, there are currently no collective bargaining agreements in place with the Teamsters Local.

30.    All of the Company's other employees, which consist primarily of store and warehouse supervisors, managers, and assistant managers, as well as corporate employees, are non-union.

---

[8] In addition, there are approximately 1,000 employees at the Franchise Stores.

14

D.    **Recent Financial Results.**[9]

31.    For the year ended December 30, 2017, the Debtors' unaudited consolidated financial statements reflected total revenues of approximately $2,494 million and a net loss of approximately $80 million. As of December 30, 2017, the Company's unaudited consolidated financial statements reflected assets totaling approximately $977 million and liabilities totaling approximately $1,176 million.

III.    **The Need for Chapter 11 Relief and the Events**
        **Leading to the Commencement of These Chapter 11 Cases**

32.    As stated above, the Debtors have commenced these Chapter 11 Cases to implement a comprehensive restructuring to right-size their balance sheet, resolve ongoing labor disputes, and achieve more favorable supply and lease terms going forward. The goals of the restructuring are to preserve the going-concern value of the Debtors' businesses, maximize creditor recoveries, provide for an equitable distribution to the Debtors' stakeholders and protect the jobs of the Debtors' approximately 14,000 employees.

A.    **Competitive Industry**

33.    The supermarket industry, including within the Company's market areas in Upstate New York, Northern Pennsylvania, and Vermont, is highly competitive. The Company faces stiff competition across multiple market segments, including from local, regional, national and international supermarket retailers, convenience stores, retail drug chains, national general merchandisers and discount retailers, membership clubs, warehouse stores and "big box" retailers, and independent and specialty grocers. The Company's in-store

---

[9] Financial results are unaudited, preliminary and subject to change, and do not reflect additional potential asset impairment charges.

WEIL:\96457936\1\77738.0003

delicatessens and prepared food offerings face competition from restaurants and fast food chains. The Company also faces intense competition from online retail giants such as Amazon.

34.    Adding to this competitive pressure is the recent growth in consumer demand for a "gourmet" shopping experience, complete with offerings of natural, organic, and gluten-free foods. Some of the Debtors' competitors have expanded aggressively in marketing a range of natural and organic foods, prepared foods, and quality specialty grocery items. The Debtors have been at a competitive disadvantage to companies that have the financial flexibility to devote greater resources to sourcing, promoting, and selling the most in-demand products.

35.    The challenging environment in which the Company operates has been compounded by falling produce and retail food prices, and competitors' increased willingness to engage in price-based competition.  In 2016, the grocery industry encountered "food deflation" of approximately 1.3%, a drastic difference from the 20-year average of 2.2% inflation.  Due to its competitive pressures, the food retail industry is characterized by slim profit margins.

36.    Recently, some of the Company's competitors have attempted to increase market share through expanding their footprint and discount pricing, creating a more difficult environment in which to consistently increase year-over-year sales. Some of the Company's competitors have greater resources and purchasing power than the Company, making it increasingly difficult for the Company to compete.

37.    Additionally, as discussed above, approximately 85% of the Company's workforce is unionized.  The workforces of some the Company's most significant competitors are not unionized, resulting in lower labor and benefit costs than the Company faces.  As a result, these competitors can offer lower prices to their customers, putting pressure on the Company to do the same, further reducing the Company's profit margin.

16

B.       **Unsustainable Capital Structure.**

38.       The most significant factor leading to the commencement of these chapter 11 cases is the amount of debt on the Company's balance sheet. As discussed further below, transactions undertaken by prior ownership burdened the Company with unsustainable leverage. The Company, in consultation with its advisors, has concluded that the Company's existing debt cannot be refinanced under current market conditions.

39.       In 2007, the Morgan Stanley Group purchased the Company from Ahold for approximately $300 million. To finance the acquisition, the Company issued approximately $200 million of term loans (the "**Morgan Stanley Acquisition Debt**"). In 2009, the Company issued $275 million of senior secured notes (the "**2009 Notes**"), the proceeds of which it used to pay down the Morgan Stanley Acquisition Debt, and issue a $105 million dividend to the Morgan Stanley Group. In 2010, to finance the Penn Traffic Acquisition, the Company issued an additional $75 million of senior secured notes (the "**2010 Notes**"), increasing the outstanding balance to $350 million. In December 2012, the Company issued $460 million of senior secured notes (the "**2012 Notes**"), the proceeds of which were used to redeem the 2009 Notes and the 2010 Notes and issue a $100 million dividend to the Morgan Stanley Group. In May 2013, less than a year before the Management Purchase, the Company issued an additional $150 million of senior unsecured notes (the "**2013 Notes**"), and used nearly all of the proceeds to pay a $142 million dividend to the Morgan Stanley Group. In addition, in October 2009, the Company entered into the ABL Facility and incurred initial borrowings of $14 million. By the time of the Management Purchase, the Company had increased its borrowings under the ABL Facility to approximately $55 million.

40.       In sum, although the Company nearly doubled in size under the Morgan Stanley Group's ownership, the Company incurred nearly $450 million of incremental

17

indebtedness.   Although, as discussed above, the Company's financial performance since the

Management Purchase has been strong, it has been unable to overcome the debt burden placed

on it as a result of the aforementioned transactions.

### C.   Liquidity Constraints.

41.   Although the vast majority of the Company's stores generate positive

EBITDA, the Company is experiencing historically low EBITDA generation as a result of the

industry pressures discussed above.   The reduced EBITDA has increased the Company's

leverage and has imposed significant strains on the Company's liquidity and cash flows.   The

strain on the Company's liquidity has been exacerbated by the costs associated with the

Company's multi-year Teamsters Arbitration described below.   A few weeks prior to the

Commencement Date, the Company secured temporary liquidity relief from C&S through an

extension of payment terms.   However, a restructuring is necessary to de-lever the Company's

balance sheet going forward.

42.   Most recently, in late 2017, American International Group, Inc. ("**AIG**"),

the Debtors' excess workers' compensation insurance provider, demanded that the Company

post an additional approximately $18 million in letters of credit in connection with an extension

of the Company's excess workers' compensation policy.   Although the Company negotiated a

shorter extension pursuant to which AIG only required an additional approximately $4.3 million

of collateral, the policy extension placed additional pressure on the Company's liquidity.

### D.   Inability to Make Capital Investments.

43.   Capital improvements and investment in operations are imperative for

food retailers to keep pace with their competition.   Market participants are introducing

technological advances and other initiatives to customize and improve consumer experience.

Companies are also implementing cost-saving technologies and practices that allow them to

WEIL:\96457936\1\77738.0003

further lower their prices, including in the areas of labor scheduling, ordering, receiving, payment processing, and data analytics. Additionally, some of the Company's stores need renovations that would enhance customer' shopping experience and generate increased revenues.

44.     The Company's increased leverage and liquidity constraints, however, have impeded its ability to invest in store renovations and in other capital and operational expenditures at the level and speed at which the food industry is evolving. Indeed, the Company did not undertake a substantial portion of the capital improvement projects and initiatives that it had previously planned to implement in 2017. Furthermore, as discussed above, the grocery sector has recently been faced with significant headwinds, making it an inopportune time to raise capital to invest in the Company's business.

> **E.     Teamsters Dispute and Arbitration.**
>
> a.     <u>Teamsters Arbitration</u>.

45.     Since 2002, C&S, through Erie Logistics, operated the WNY Warehouses pursuant to earlier supply agreements with Tops Markets. As discussed above, on December 22, 2013, Tops Markets acquired all of the membership interests in, and certain assets of, Debtor Erie Logistics from C&S (the Erie Transaction). Erie Logistics currently operates the Lancaster Warehouse and the West Seneca Facility employs the warehouse and driver personnel at such facilities, the vast majority of whom are represented by the Teamsters Local.

46.     In late January 2014, following the Erie Transaction, the Company received notice that the New York State Teamsters Conference Pension and Retirement Fund (the "**Teamsters Pension Fund**" or the "**Fund**") had suspended Erie Logistics as a participating employer pending the Fund's investigation into the acquisition of Erie Logistics from C&S. This suspension was retroactive to the effective date of the Erie Transaction. On May 27, 2014, the Fund contended that the Erie Transaction constituted a withdrawal from the Teamsters Pension

Fund, which gave rise to an alleged withdrawal liability of approximately $183.7 million, payable in a lump sum or in monthly installments (the "**Withdrawal Liability**"). C&S, as the parent of an ERISA control group, and Erie Logistics were assessed joint and several liability for the Withdrawal Liability calculated to give effect to a limit on total withdrawal liability imposed by the Employee Retirement Income Security Act of 1974 ("**ERISA**") – of $641,514 for 240 months.

47.     Since the alleged withdrawal, the Debtors, on behalf of Erie Logistics, have remitted, consistent with ERISA § 4219's "pay now, dispute later" scheme, approximately $27.6 million toward the Withdrawal Liability. The payments were made directly to, and remain with, the Teamsters Pension Fund. In addition, through May 2017, the Company has tendered approximately $16.3 million in regular monthly pension contributions to the Teamsters Pension Fund, all of which – except for approximately $500,000 – have been rejected and returned by the Fund.

48.     C&S, the Company and the Teamsters Pension Fund have been participating in an arbitration proceeding under ERISA regarding the issue of whether a Withdrawal Liability was triggered as a result of the Erie Transaction (the "**Teamsters Arbitration**"). Arbitration hearings have been completed. Briefing is scheduled to be completed by March 30, 2018. A mediation is scheduled for the first week in May 2018. To date, the Company has incurred approximately $14 million in legal fees and expenses in connection with the Teamsters Arbitration[10] and various related matters, placing a substantial strain on the Company's liquidity.

b.     Teamsters CBA.

---

[10] This estimate includes amounts paid for C&S's legal fees and expenses pursuant to the Debtors' indemnification obligation.

20

49.     The Erie Transaction was originally intended to be structured as a sale of all of the assets of Erie Logistics to Tops Markets in compliance with the applicable provisions of ERISA.  Accordingly, in August 2013, prior to the closing of the Erie Transaction, Tops Markets, Erie Logistics (at the time owned by C&S), and the Teamsters Local entered into a non-binding memorandum of agreement (the "**2013 MOA**"), which provided, among other things, that (a) Tops Markets and Erie Logistics were negotiating an agreement by which Tops Markets would assume the operation of the WNY Warehouses, (b) Tops Markets would assume the Teamsters CBAs, and (c) the Teamsters CBAs would be extended to August 2019.  In October 2013, when the structure of the Erie Transaction changed from being an asset sale, the Company proposed a side letter agreement (the "**MOA Side Letter**") modifying the 2013 MOA to reflect the revised structure, but the Teamsters Local has never executed the proposed MOA Side Letter.

50.     As a result, a factual dispute arose between the Company and the Teamsters Local as to whether the 2013 MOA remained operative, and thus extended the Teamsters CBA to August 2019 as was contemplated by the 2013 MOA.  As required under federal labor laws, the Company continued to comply with the key provisions of the Teamsters CBAs, including the payment of salaries, sponsorship of the medical plan, and contributions to the health and wellness fund.  However, because the Teamsters Pension Fund has refused to accept nearly all of the Company's contributions for pension benefits, the members of the Teamsters Local have not accrued pension benefits since December 22, 2013.

51.     In July 18, 2014, the Company filed a charge (the "**NLRB Action**") with the National Labor Relations Board (the "**NLRB**") arguing that the Teamsters CBAs continue to 2019 pursuant to the 2013 MOA and the MOA Side Letter.  The NLRB initially determined that the Teamsters CBA was extended through August 2017, but the Company requested that the

21

NLRB reconsider its decision.  On February 2, 2018, the NLRB denied the Company's request for reconsideration.[11]  To date, the Company has incurred substantial legal fees and expenses in connection with the NLRB Action.  Moreover, given that the Company currently does not have a CBA with the Teamsters Local in place, there is no contractual impediment to a potential strike by the members of the Teamsters Local.  However, as discussed above, the Company intends to engage with the Teamsters Local during the Chapter 11 Cases with a goal of reaching a consensual resolution.

## IV.   Corporate and Capital Structure

### A.   Corporate Structure

52.   As discussed above, the Company is currently management-owned.  Consequently, none of the Debtors' equity securities are publicly-traded.  Tops MBO is the direct corporate parent of Holding II.  Holding II, in turn, is the direct or indirect corporate parent of each of the remaining Debtors.  All of the outstanding equity interests in Tops MBO are owned by eleven (11) individuals, including five (5) members of the Debtors' senior management team.

53.   As stated above, I was recently appointed as the CRO for all of the Debtors.  The remainder of Debtors' senior management team consists of the following individuals:

| Name | Position |
|---|---|
| Frank Curci | Chairman of the Board and Chief Executive Officer |
| David Langless | Executive Vice President and Chief Financial Officer |
| John Persons | President and Chief Operating Officer |

---

[11] The Company also attempted to resolve this dispute through mediation, but a resolution was not reached.

| Name | Position |
|------|----------|
| Jack Barrett | Executive Vice President, Human Resources, Assistant Secretary |
| Ron Ferri | Executive Vice President, Operations |

54.     Each Debtor, except for Debtors Tops Holding LLC and Tops PT, LLC, is governed by a six-member Board, the membership of which is as follows:

| Name | Position |
|------|----------|
| Frank Curci | Chairman of the Board |
| David Langless | Director |
| John Persons | Director |
| Jack Barrett | Director |
| Ron Ferri | Director |
| Lynne Burgess | Director |

55.     Tops Holding LLC and Tops PT, LLC are limited liability companies that do not have boards of managers.  Instead, Tops Holding LLC is managed by its sole member, Tops Holding II Corporation, and Tops PT, LLC is managed by its sole ember, Tops Markets, LLC.

56.     Additional information regarding the Debtors' senior management team is set forth in **Schedule 10** annexed hereto.

**B.    Capital Structure**

57.     As set forth below, as of the Commencement Date, the Debtors have outstanding funded debt obligations consisting of (i) approximately $68 million in senior lien secured debt outstanding under the ABL Facility, plus approximately $34 million in outstanding Letters of Credit, and the $10 million FILO Loan (as defined below); (ii) a face amount of $560

23

million of Senior Secured Notes, (iii) a face amount of $67.5 million of OpCo Unsecured Notes; and (iii) a face amount of $8.6 million of HoldCo Unsecured Notes (all as defined below).

a.    <em>Secured Debt – ABL Facility and Secured Senior Notes.</em>

58.    <u>ABL Credit Facility</u>.    Pursuant to that certain Second Amended and Restated Credit Agreement, dated as of December 30, 2016 (as amended, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**"), by and among Tops Markets LLC, as lead borrower, the guarantor parties thereto, Bank of America, N.A., as administrative agent, collateral agent, swingline lender and letter of credit issuer (the "**ABL Credit Facility Agent**"), and each of the lenders parties thereto (the "**ABL Lenders**"), the ABL Lenders provided the Debtors with an asset-based revolving credit facility in an amount up to $140 million, subject to a borrowing base formula (the "**ABL Facility**").

59.    Up to $75 million of the ABL Facility is available for issuances of letters of credit (the "**Letters of Credit**") and any such issuance of letters of credit reduce the amount available under the ABL Facility on a dollar for dollar basis.  Up to $15 million of the ABL Facility is available for swing line loans.  In addition, pursuant to the ABL Credit Agreement, the ABL Lenders extended to the Debtors a $10 million "first-in last-out" term loan (the "**FILO Loan**").

60.    Availability under the ABL Credit Agreement is capped by a borrowing base, which is calculated based on certain percentages of the value of the Debtors' inventory, receivables and prescription lists, and is subject to certain reserves and sub-limits.  The ABL Credit Agreement, including the FILO Loan, matures on December 30, 2021.  As of the date hereof, the aggregate principal amount outstanding under the ABL Credit Facility is approximately $68 million, plus approximately $34 million in outstanding Letters of Credit, and the $10 million FILO Loan.

24

61.    <u>Senior Secured Notes</u>.  As of the Commencement Date, the Debtors have outstanding secured note obligations consisting of $560 million in aggregate outstanding principal of 8.000% Senior Secured Notes due 2022 (the "**Senior Secured Notes**") issued pursuant to that certain indenture (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Secured Notes Indenture**") by and between Tops Markets II Corporation and Tops Holding LLC, as issuers, the guarantor parties thereto, and U.S. Bank National Association, as trustee and collateral agent (the "**Senior Secured Notes Trustee**"), dated as of June 10, 2015.  The Senior Secured Notes mature on June 15, 2022.

62.    <u>Secured Debt Collateral</u>.  The ABL Facility and the Senior Secured Notes, together, are herein referred to as the "**Senior Debt.**"  The Debtors' obligations under the Senior Debt are collateralized by first-priority "criss-cross" liens on substantially all of the Debtors' assets (with certain specified exceptions) including, but not limited to, all accounts, goods, documents, instruments, equipment, inventory, fixtures, letters of credit, investment property, intellectual property, commercial tort claims, general intangibles, deposit accounts, and any other personal property of the Debtors (the "**Common Collateral**").  Pursuant to that certain Guarantee and Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**ABL Security Agreement**"), by and between Tops Markets, LLC, as lead borrower, the other borrowers and guarantors party thereto, and Bank of America as collateral agent, dated as of October 9, 2009, the Debtors' obligations under the ABL Facility are secured by first priority liens on, among other things, all accounts and credit card receivables, inventory, and prescription lists (collectively, the "**ABL Priority Collateral**"). Pursuant to that certain Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and

25

between Tops Markets II Corporation and Tops Holding LLC, as issuers, the guarantor parties thereto, and the Senior Secured Notes Trustee, dated as of June 10, 2015, the Debtors' obligations under the Secured Notes Indenture are secured by first priority liens on, among other things, equipment and fixtures, intellectual property, and certain real estate, including the Lancaster Warehouse and one retail facility (the "**Secured Notes Priority Collateral**").

63.     Intercreditor Agreement.  The relative rights, positions and priorities of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and the liens held by (i) the ABL Credit Facility Agent on behalf of the ABL Lenders (collectively, the "**ABL Secured Parties**") and (ii) the Senior Secured Notes Trustee on behalf of the holders of the Senior Secured Notes (the "**Senior Notes Secured Parties**") are set forth in that certain Intercreditor Agreement, by and between the ABL Credit Facility Agent and the Senior Secured Notes Trustee, dated as of December 20, 2012 (as amended by that certain Intercreditor Agreement Joinder, dated as of June 10, 2015, and that certain First Amendment to Intercreditor Agreement dated as of December 30, 2016, and as may be further amended and restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"). Pursuant to the Intercreditor Agreement, the ABL Secured Parties hold a first priority lien in the ABL Priority Collateral and a second priority lien in the Notes Priority Collateral (each as defined in the Intercreditor Agreement), except for certain real estate, including the Lancaster Warehouse and one retail facility.  The Senior Notes Secured Parties hold a first priority lien in the Notes Priority Collateral and a second priority lien in the ABL Priority Collateral.

b.     *Unsecured Debt.*

64.     OpCo Unsecured Notes.  As of the Commencement Date, the Debtors have outstanding unsecured note obligations consisting of $67.5 million in aggregate outstanding principal of 9.000% Senior Amortizing Notes due 2021 (the "**OpCo Unsecured Notes**") issued

26

pursuant to that certain indenture (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**OpCo Unsecured Notes Indenture**") by and between Tops Markets II Corporation and Tops Holding LLC, as issuers, the guarantor parties thereto, and U.S. Bank National Association, as trustee, dated as of August 9, 2017.  The OpCo Unsecured Notes mature on March 15, 2021.

65.     <u>HoldCo Unsecured Notes</u>.  As of the Commencement Date, the Debtors have outstanding unsecured note obligations consisting of $8.6 million in aggregate outstanding principal of 8.750% / 9.500% Senior Notes due 2018 (the "**HoldCo Unsecured Notes**") issued pursuant to that certain indenture (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**HoldCo Unsecured Notes Indenture**") by and between Holding II, as issuer, and U.S. Bank National Association, as trustee, dated as of May 15, 2013.  The HoldCo Unsecured Notes mature on June 15, 2018.  The Debtors may elect to pay interest due on the HoldCo Unsecured Notes on each interest payment date (i) entirely in cash at the rate of 8.750% per annum, or (ii) entirely in payment-in-kind ("**PIK**") interest at the rate of 9.500% per annum.

c.     *Trade Claims*.

66.     In the ordinary course of business, the Debtors incur various fixed, liquidated, and undisputed payment obligations (the "**Trade Claims**") to various third-party providers of goods and services (the "**Trade Creditors**") that are sold in the Debtors' stores or facilitate the Debtors' business operations.  As of the date hereof, the Debtors estimate that the aggregate amount of Trade Claims outstanding is approximately $125 – $135 million. A majority of the Debtors' general unsecured claims are Trade Claims.  Certain of the Trade Claims are entitled to statutory priority, such as under PACA or PASA or under section 503(b)(9) of the Bankruptcy Code, may give rise to shippers or mechanics liens against the Debtors' property if

WEIL:\96457936\1\77738.0003

unpaid, relate to funds held in trust by the Debtors that are not the property of the Debtors' estates, or are secured by letters of credit, security deposits, or rights of setoff (collectively, the "**Priority Trade Claims**"). Excluding the Priority Trade Claims, the Debtors estimate that the total Trade Claims equal approximately $25 million.

d.    *Equity Ownership*.

67.    As discussed in Section IV.A., Tops MBO owns over 99% of the outstanding equity interests in Holdings. Four (4) of the Company's directors each own a single common share of Holdings. All of the equity interests in Tops MBO are, in turn, owned by members of the Company's management team.

## V.    <u>First-Day Pleadings</u>

68.    As stated, the Debtors operate in a highly competitive industry. It is imperative that they make a seamless transition into chapter 11 to preserve the reputation of their businesses and the loyalty and goodwill of their customers, suppliers and employees. Sales and operations must continue in the ordinary course of business to preserve the value of the Debtors' business. Accordingly, the Debtors have filed a number of First Day Pleadings designed to facilitate their transition into these chapter 11 cases. The Debtors anticipate that the Court will conduct a hearing soon after the Commencement Date at which the Court will hear and consider many of the First Day Pleadings.[12]

69.    I have reviewed each of the First Day Pleadings with the Debtors' counsel, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and will be necessary and critical to the Debtors' ability to successfully execute

---

[12] Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleading.

28

a restructuring and is in the best interests of the Debtors' estates and creditors.  A description of the relief requested and the facts supporting each of the pleadings is set forth below.

### A.    Administrative Motions

(i)    Motion of Debtors for Entry of an Order Directing the Joint Administration of their Related Chapter 11 Cases (the "**Joint Administration Motion**")

70.    The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Tops Holding II Corporation.

71.    Joint administration of the chapter 11 cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest.  Many of the motions, hearings and orders that will be filed in the chapter 11 cases almost certainly will affect each of the Debtors.  The entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings, and will allow all parties in interest to monitor the chapter 11 cases with greater ease and efficiency.  The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 with the least disruption.

(ii)    Motion of Debtors for Entry of Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "**Schedules and Statements Motion**")

72.    The Debtors request entry of an order granting additional time to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs.  As a consequence of the size and complexity of the Debtors'

29

business operations, the number of creditors likely to be involved in these chapter 11 cases, the geographical spread of the Debtors' operations, the numerous critical operational matters that the Debtors' management and employees must address, a 60-day extension (without prejudice to further extensions) is necessary and appropriate.

73.    To prepare the Schedules, the Debtors must compile information from books, records, and other documents relating to, among other things, accounts payable and receivable, real estate and capital leases, employee wages and benefits, intercompany transactions, and vendor and supplier agreements in connection with their 169 store locations. Collecting the necessary information to prepare the Schedules requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professionals.  While the Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules, the Debtors' resources are strained.  I believe an extension of the time to file the Schedules will ultimately maximize the value of the Debtors' estates for the benefit of their creditors and all other parties in interest.

(iii)    Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated List of Creditors (B) File a Consolidated List of Debtors' 20 Largest Unsecured Claims, (II) Authorizing Debtors to Redact Certain Personal Identification Information for Individual Creditors and Interest Holders, and (III) Approving Form and Manner of Notifying Creditors of Commencement of these Chapter 11 Cases (the "**Creditor Matrix Motion**")

74.    The Debtors seek entry of an order (i) authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting separate mailing matrices for each individual Debtor (the "**Creditor Matrix**") and (b) file a consolidated list of the Debtors' twenty (20) largest unsecured claims; (ii) authorizing the Debtors to redact certain personal identification information for individual creditors and interest holders; and (iii) approving the form and manner of notifying creditors of commencement of these chapter 11 cases.

30

75.    Permitting the Debtors to maintain one single consolidated list of creditors in lieu of filing a separate creditor matrix for each Debtor entity is warranted under the circumstances of these chapter 11 cases.  Specifically, maintaining a single consolidated Creditor Matrix will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate mailings.

76.    Cause exists to authorize the Debtors to redact address information of individual creditors – many of whom are the Debtors' employees – and interest holders from the creditor list because such information is sensitive and could be used to perpetrate identity theft. It is also unnecessary to disclose.  The Debtors propose to provide, under seal, an unredacted version of the Creditor Matrix to the Bankruptcy Court, the United States Trustee, and any official committee of unsecured creditors appointed in the Chapter 11 Cases, upon request.

     (iv)    Motion of Debtors for Entry of Order Implementing Certain Notice and Case Management Procedures (the "**Case Management Motion**")

77.    The Debtors seek entry of an order approving and implementing the notice, case management, and administrative procedures therein (collectively, the "**Case Management Procedures**").

78.    Given the size and scope of these cases, the Case Management Procedures will facilitate service of notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents, and other papers filed in these chapter 11 cases that will be less burdensome and costly than serving such documents on every potentially interested party.  This, in turn, will maximize the efficiency and orderly administration of these chapter 11 cases, while at the same time ensuring that appropriate notice is provided.

31

**B.    Operational Motions Requesting Immediate Relief**

79.    The Debtors intend to ask for immediate relief with respect to the following First Day Pleadings and, therefore, will present these motions at the First Day Hearing.

(i)    Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§105, 361, 362, 363, 364 and 507 (I) Authorizing Obtaining Postpetition Financing; (II) Authorizing Use of Cash Collateral; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying Automatic Stay; (VI) Scheduling Final Hearing; and (VII) Granting Related Relief (the "**DIP Motion**")

80.    The Debtors request entry of interim and final orders: (i) authorizing the Debtors to obtain senior secured, superpriority, postpetition financing consisting consists of two facilities – the DIP ABL Facility and the DIP Term Loan Facility (together, the "**DIP Facility**"); (ii) authorizing the Debtors to use cash collateral (as defined in section 363(a) of the Bankruptcy Code, the "**Cash Collateral**"); (iii) granting adequate protection to the Prepetition Secured Parties (as defined in the Interim DIP Order (as defined below)); (iv) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim Order; and (v) scheduling a hearing to consider the relief requested herein on a final basis (the "**Final Hearing**").

81.    In addition to financing these chapter 11 cases by utilizing the DIP Facility, the Debtors intend to use the Cash Collateral, which consists of cash on hand as of the Petition Date and the cash generated postpetition that is the proceeds of the collateral subject to the liens of the DIP Lenders and Prepetition Secured Parties.  The use of the Cash Collateral and the DIP Facility are necessary to maintain the Debtors' operations and to fund their expenses during these chapter 11 cases.   All of the Debtors' receipts from operations are concentrated in three accounts, which as of the Commencement Date, are subject to the daily sweep by Bank of America in its capacity as the Prepetition ABL Agent.  Funds from these accounts will continue

32

to be swept by the DIP ABL Agent postpetition. However, unless an "Event of Default" under the DIP ABL Agreement has occurred and is continuing, for so long as there are no DIP ABL Loans outstanding, the swept amounts will be returned to the Debtors by the DIP ABL Agent on the same date and the Debtors will be authorized to use such funds in accordance with the DIP Order.

82.     The Debtors, with the assistance of FTI and Evercore, have developed detailed projections of the anticipated receipts and disbursements that will be incurred during these chapter 11 cases, which projections are reflected in the 13-week budget attached to the DIP Motion (the "**Interim DIP Budget**"). The Interim DIP Budget reflects a reasonable and detailed estimate of the Debtors' need to pay various trade vendors and employees and other obligations in the ordinary course of business during the initial 13 weeks of the Chapter 11 Cases.

83.     The initial funding of $62.5 million under the DIP Term Loan to repay the Prepetition ABL Filo Loan and reduce outstanding DIP ABL Obligations will free up availability under the DIP ABL Facility. The funding contemplated by the proposed Interim and Final DIP Orders and the use of the Cash Collateral guarantee that the Debtors' cash needs will be fulfilled, provide comfort to customers and trade vendors, and minimize the potential for business disruption and loss of value during the pendency of the Chapter 11 Cases.

84.     The Interim DIP Budget takes into account, among other things, the adequate protection payments to the DIP Lenders and Prepetition Secured Parties. If the Debtors are unable to use Cash Collateral and provide adequate protection related thereto, they may be forced to cease operations, which would result in irreparable harm to their businesses. Accordingly, the proposed terms of adequate protection are appropriate and consistent with the terms generally provided in comparable chapter 11 cases.

WEIL:\96457936\1\77738.0003

      (ii)     Motion of Debtors for Authority, but not Direction, to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits, and (C) Continue Employee Benefits Program, and for Related Relief (the "**Wages and Benefits Motion**")

85.      The Debtors request authority, but not direction, to pay and honor certain prepetition claims and obligations, continue programs and maintain funding, in the exercise of their discretion, relating to, among other things: (a) Unpaid Compensation, Deductions, and Payroll Taxes; (b) Non-Insider Incentive Plans; (c) compensation for their Supplemental Workforce; (d) Reimbursable Expenses and Bank of America Credit Cards Program; (e) Union and Non-Union Employee Benefit Plans; (f) non-insider Severance Programs; (g) the Insurance Plans; (h) the Retirement Plans; and (i) the multi-employer plans (as defined in the Wages and Benefits Motion).

86.      The relief requested includes compensation for the Debtors' full-time and part-time employees, temporary employees retained through an outside agency, and numerous independent contractors and consultants that provide services related to various aspects of the Debtors' operations and are vital to the Debtors' businesses.  As of the date hereof, certain prepetition obligations to such employees and supplemental workers may be due and owing.

87.      The majority of the Debtors' workforce relies on the Debtors' compensation, benefits, and reimbursement of expenses to satisfy daily living expenses.  The workforce will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such obligations, morale and loyalty will be jeopardized at a time when support is critical.  In the absence of such payments, the workforce may seek alternative employment opportunities, including with the Debtors' competitors, hindering the Debtors' ability to meet their customer obligations and likely diminishing customer confidence.

Loss of valuable employees, who are the lifeblood of the Debtors' operations, would distract the Debtors' from focusing on their operations and administering these chapter 11 cases.

88.     Furthermore, if the Court does not authorize the Debtors to continue to honor their various obligations under the insurance programs, the employees will not receive health coverage and, thus, may become obligated to pay certain heath care claims in cases where the Debtors have not paid the respective insurance providers.  The loss of health care coverage will result in considerable anxiety for employees (and likely attrition) at a time when the Debtors need such employees to perform their jobs at peak efficiency.

(iii)   Motion of Debtors for (I) Authorization to (A) Continue to Maintain their Insurance Policies and Programs and Surety Bonds and (B) Honor All Obligations with Respect Thereto and (II) Modification of the Automatic Stay with Respect to the Workers' Compensation Program ("**Insurance Motion**")

89.     The Debtors request (i) authority, but not direction, to (a) continue to maintain, and renew, in their sole discretion, their Insurance Policies and Programs (including the Workers' Compensation Program and the Debtors' premium financing arrangements) and the Surety Bond Program, (b) honor their Insurance and Surety Obligations in the ordinary course of business during the Chapter 11 Cases, and (c) pay any prepetition Insurance and Surety Obligations, including, without limitation, amounts owed under the Premium Financing Agreements and to the Insurance Service Providers, and (ii) modification of the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program.

90.     The Debtors maintain various liability, property and other insurance policies to help manage and limit the various risks associated with operating their businesses. The Debtors also maintain workers' compensation insurance as required by statute in each of the states in which they operate.  Certain of the Debtors' workers' compensation programs are self-

35

insured, whereas others are insured by third-party insurers. The Debtors estimate they pay approximately $700,000 to $1 million per month on account of workers' compensation claims. To secure payment of these and other amounts, the Debtors have posted various forms of collateral, which, as of the Commencement Date, total approximately $30.3 million.

91.     The Debtors utilize certain insurance brokers, primarily Lawley (the "**Insurance Brokers**"), to assist with the procurement and negotiation of certain Insurance Policies and, in certain circumstances, to remit payment to the Insurance Carriers on behalf of the Debtors for the relevant policy periods. The Debtors' employ third-party administrators, The Travelers Companies, Inc. ("**Travelers**") and Western New York Claims Services, LLC ("**WNY**") (together, the "**Third-Party Administrators**"), to investigate, administer and pay claims arising under their Workers' Compensation Program and general liability program.

92.     Pursuant to the Surety Bond Program, in the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties, including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations.

93.     Postpetition, the Debtors' Insurance Policies and Programs and Surety Bond Program are essential to the preservation of the value of the Debtors' businesses, properties and assets, and, in certain instances, are required by law. If any of the Debtors' insurance policies are terminated or lapse, the Debtors would be exposed to substantial liability to the detriment of all parties in interest and could be in violation of law. State law may prohibit the Debtors from operating without certain insurance. The Insurance Brokers and Third-Party Administrators are intimately familiar with the Debtors' policies and programs, and the loss of either Insurance Service Provider (or even a temporary disruption in their services) would be

detrimental to the Debtors' chapter 11 estates because the Debtors' would need to shift some of their focus from administering their estates and businesses to managing the Debtors' multitude of insurance policies and the claims arising thereunder. Accordingly, the continuation of the Insurance Policies and Programs and the authority to pay, in the Debtors' discretion, all Insurance Obligations, including any unpaid prepetition Insurance Obligations, is essential to preserve the Debtors' businesses and the value of the Debtors' estates for all parties in interest. Further, there is cause to modify the automatic stay because staying the workers' compensation claims could cause employee departures or otherwise harm employee morale, which would severely disrupt the Debtors' business and prevent a successful reorganization.

94.     With respect to the Surety Bond Program, to continue their business operations during the reorganization process, the Debtors must be able to provide financial assurances to state governments, regulatory agencies, and other contract third parties. This requires the Debtors to maintain their existing Surety Bond Program, including the payment of the Surety Premiums as and when they come due, providing the Sureties with collateral, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of the Debtors' business. A failure to continue honoring the Surety Bond Program may result in violations of applicable law and breaches under the Debtors' critical contracts, which could be disruptive to the Debtors' operations and impair value of the Debtors' stakeholders. Authority to honor the Surety Bond Program is essential to preserving the Debtors' businesses and the value of the Debtors' estates for all parties in interest.

(iv)    Motion of Debtors Requesting Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, and (IV) Provide Administrative Expense Priority for

37

Postpetition Intercompany Claims, and (V) for Related Relief (the "**Cash Management Motion**")

95.     The Debtors request authorization to (a) continue their existing cash management system, including the continued maintenance of their existing bank accounts and business forms, (b) implement changes to their cash management system in the ordinary course of business, including opening new or closing existing bank accounts, (c) continue to perform under and honor intercompany transactions in the ordinary course of business, in their business judgment and at their sole discretion, and (d) provide administrative expense priority for postpetition intercompany claims.  The Debtors also request that the Court grant any necessary relief related to the foregoing.

96.     The Debtors further request that the Court authorize and direct the financial institutions at which the Debtors maintain various bank accounts to (a) continue to maintain, service, and administer the Debtors' bank accounts, and (b) debit the bank accounts in the ordinary course of business on account of (i) wire transfers or checks drawn on the bank accounts, <u>provided</u> that any payments drawn, issued or made prior to the Commencement Date shall not be honored absent direction of the Debtors and an order of the Court authorizing such prepetition payment, or (ii) undisputed service charges owed to the banks for maintenance of the Debtors' cash management system, if any.

97.     In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, concentrate, and disburse funds generated by their operations (the "**Cash Management System**").   The Cash Management System is comprised of forty-nine (49) bank accounts (collectively, the "**Bank Accounts**") maintained at various financial institutions (the "**Banks**") and used to collect, organize, and/or track various forms of cash receipts and disbursements.  The Cash Management System enables the Debtors to

38

efficiently collect and disburse cash generated by their business, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and obtain accurate account balances and other financial data.  It is critical that the Cash Management System remain intact during these chapter 11 cases to ensure seamless continuation of transactions and uninterrupted collection of revenues.

98.    The Cash Management System constitutes an ordinary course and essential business practice of the Debtors.  The Cash Management System provides significant benefits to the Debtors including, among other things, the ability to (i) control corporate funds, (ii) ensure the maximum availability of funds when and where necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account information.

99.    The operation of the Debtors' businesses requires that the Cash Management System continue during the pendency of the Chapter 11 Cases.  As a practical matter, because of the Debtors' corporate and financial structure, it would be extremely difficult and expensive to establish and maintain a separate cash management system for each Debtor. Requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these cases would be extraordinarily disruptive and harmful to their operations. Any such disruption would have a severe and adverse impact upon the Debtors' chapter 11 estates.  Consequently, maintaining the existing Cash Management System is in the best interest of all parties in interest.  In addition, payment of any prepetition Service Charges is in the best interests of the Debtors and all parties in interest in these chapter 11 cases, as it will prevent

WEIL:\96457936\1\77738.0003

unnecessary disruptions to the Cash Management System and ensure that the Debtors' receipt of funds are not delayed.

100.    In the ordinary course of business, the Debtors maintain detailed accounting of revenues and expenses for each individual store and allocate certain overhead expenses to individual stores.  After the Commencement Date, the Debtors will begin grouping such store-by-store accounting by legal entity, and will record intercompany payables and receivables between legal entities in the ordinary course.  Continuation of the Intercompany Transactions in the Cash Management System is in the best interests of the Debtors, their estates, and all parties in interest.

101.    If the Debtors are not permitted to maintain and continue to use their Bank Accounts and Business Forms, the resulting prejudice will include (i) severe and likely irreparable disruption of the Debtors' ordinary financial affairs and business operations, (ii) delay in the administration of the Debtors' estates and (iii) cost to the estates to set up new systems, open new accounts, and order new Business Forms.  The Debtors believe that their chapter 11 cases will be more orderly if they are permitted to maintain all Bank Accounts with the same account numbers during these chapter 11 cases.  By preserving business continuity and avoiding the disruption and delay to the Debtors' disbursement obligations, all parties in interest, including employees, vendors, and customers, will be best served by the relief requested.  In addition, to the extent necessary, the Debtors request authorization to open new bank accounts at their existing Banks or other authorized depositories designated by the U.S. Trustee.  By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors transact, it is important that the Debtors be permitted to continue to use their existing Business Forms without alteration or change, except as requested

40

herein.  Indeed, because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicized nature of these cases and the notice of commencement the Debtors are distributing to such parties, changing their Business Forms would be unnecessary and unduly burdensome.

> (v)    Motion of Debtors for Authorization to Pay Certain Prepetition Obligations to Critical Vendors, and Related Relief (the "**Critical Vendors Motion**")

102.    The Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to pay up to $36 million (the "**Critical Vendor Cap**") in prepetition claims of certain vendors, suppliers, service providers, and other similar entities that the Debtors determine, in their sole discretion and based on their sound business judgment, and subject to the procedures and conditions set forth in the Critical Vendor Payment Protocol (as defined herein), are essential to their ongoing business operations and maximizing the value of their enterprise (the "**Critical Vendors**;" whose prepetition claims shall be defined as the "**Critical Vendor Claims**"); (ii) approving a procedure to address those vendors who repudiate and refuse to honor their contractual obligations to the Debtors; and (iii) granting related relief.

103.    The Debtors also seek approval of (i) their protocol for reviewing and approving requests for payment of Critical Vendor Claims (the "**Critical Vendor Payment Protocol**"); (ii) the Form of Notice of Critical Vendor Payment Protocol that will be provided to any vendors requesting Critical Vendor status and payment of Critical Vendor Claims (the "**Critical Vendor Notice**"); (iii) the Form of Vendor Agreement; (iv) the Form of Notice of Repudiating Vendor; and (v) the Form of Order to Show Cause.

104.    The Debtors, like all supermarket operators, must keep a large variety of goods readily available to satisfy customer demands.  The goods sold by the Debtors are, in large part, perishable in nature.  For these reasons, the Debtors experience significantly higher rates of

41

inventory turnover than retailers in other industries do.  The Debtors must continuously re-stock as a function of both perishability and customer demand.  Simply put, without a constant stream of goods, the Debtors' shelves would quickly run empty, directly affecting sales and revenue.

105.    To keep their businesses running efficiently and seamlessly, the Debtors rely on a carefully-designed inventory system through which their almost 170 store locations receive daily deliveries of branded and non-branded products including baked goods, frozen foods and desserts, carbonated beverages and water, cookies and salty snacks, and beer, wine, and liquor via direct-store-delivery ("**DSD**") or similar supply processes.  DSD vendors also supply fresh and perishable foodstuffs, including bread, milk, eggs, cheese and other dairy and deli products.  Many of the DSD vendors are invaluable, as they are sole- or limited-source or high-volume suppliers for certain popular branded or otherwise "in-demand" goods (as determined by local or regional customer preferences).  In addition, many of the Debtors' beer, wine, and liquor distributors hold exclusive distribution rights to a geographic region— effectively requiring the Debtors to utilize these particular merchandisers as sole-source providers in those areas.

106.    As noted above, the Debtors do not have long-term supply agreements with many of their DSD vendors and goods are supplied on an order-by-order, week-by-week, and even day-by-day basis.  Accordingly, despite their heavy reliance on DSD vendors, the Debtors have limited leverage to compel performance on commercially reasonable terms.  Additionally, in many instances, the Debtors simply cannot obtain the branded products supplied from the DSD vendors from other third-party suppliers.

107.    The Debtors and their advisors engaged in a process to (i) identify those vendors, suppliers and/or service-providers that may be "critical" to the Debtors' businesses (the

42

"**Potential Critical Vendors**") and (ii) estimate the aggregate unpaid amount owed to such Potential Critical Vendors as of the Commencement Date to establish the Critical Vendor Cap.

108.    More specifically, the Debtors and their advisors spent significant time and effort reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify business relationships which, if lost, could materially harm the Debtors' businesses, shrink their market share, reduce their enterprise value, and/or impair their restructuring process. In this process, the Debtors considered a variety of factors, as set forth in the Critical Vendors Motion.

109.    The Debtors reviewed a universe of approximately 3,100 separate accounts in their accounts payable system.  The Debtors identified approximately 90 active accounts that may be subject to the Warehousemen, Lienholders, and PACA/PASA Motion (defined below).  Of the remaining accounts, the Debtors identified approximately 225 active accounts with approximately 150 Potential Critical Vendors, and an additional approximately 70 active accounts with beer, wine, and liquor and milk suppliers.  A substantial majority of the Potential Critical Vendors are DSD vendors that (i) supply top-of-mind brands customers expect to find in the Debtors' stores, and (ii) are either (a) sole-source providers or (b) cannot be replaced in a cost-efficient manner or without causing irreparable harm to the Debtors' operations.  Moreover, virtually all of the Potential Critical Vendors do not have a contractual relationship with the Debtors.

110.    The Debtors estimate that they owe the Potential Critical Vendors an aggregate amount of approximately $36 million as of the Commencement Date, including claims totaling approximately $25 million and that may be entitled to priority pursuant to section

43

503(b)(9) of the Bankruptcy Code.  Approximately $11 million of the requested Critical Vendor Cap relates to prepetition claims for milk or alcohol.  The $36 million Critical Vendor Cap is approximately 27% of the Debtors total accrued payables of approximately $132 million, and the Debtors anticipate that approximately 69% of the Critical Vendor Cap will be used to pay claims that may be entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code.

111.    The Debtors' ongoing ability to obtain goods and services from their Critical Vendors as provided herein is necessary to preserve the value of their estates.  Absent payment of the Critical Vendor Claims the Debtors could be unable to maintain sufficient levels of inventory with the variety, freshness, and quality their customers have come to expect.  Similarly, a Repudiating Vendor's refusal to provide goods or services to the Debtors could be devastating to the Debtors' business.  The Debtors must be able to continue to operate their stores in the ordinary course of business in order to maximize the value available for distribution to creditors, which requires cooperation from certain key vendors.  And, as noted above, the Debtors' failure to timely pay certain vendors could accelerate payment terms as a matter of law or regulation.  Consequently, the Debtors' requests for authority to honor the Critical Vendor Claims pursuant to the Critical Vendor Payment Protocol, and implement the Repudiating Vendor Procedures, are both consistent with the priorities established by the Bankruptcy Code and necessary to preserve the value of their business.

112.    The Debtors will also use this authority to secure Customary Trade Terms from their vendors.  Absent the relief requested in the Critical Vendors Motion, Critical Vendors may have no incentive to continue to provide the Debtors with trade credit or, in some cases, may be legally prohibited from providing trade credit.  The preservation of working capital through the retention or reinstatement of trade credit in sufficient amounts and on favorable

WEIL:\96457936\1\77738.0003

terms will conserve liquidity, stabilize the Debtors' business operations, and facilitate their ability to maximize value.

> (vi)     Motion of Debtors for Interim and Final Authority to (I) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices and (II) Pay and Honor Related Prepetition Obligations (the "**Customer Programs Motion**")

113.    The Debtors request authority to, in the ordinary course of business and consistent with past practice, (i) maintain and administer customer programs, promotions and practices, as necessary and appropriate in the Debtors' business judgment, and (ii) to pay and otherwise honor their obligations to customers relating thereto, whether arising prior to or after the Commencement Date.

114.    The Debtors' businesses depend upon the loyalty of their customers. To maximize customer loyalty, the Debtors have maintained and followed, in the ordinary course of business, various practices and programs (collectively, the "**Customer Programs**") to reward and provide incentives to existing customers and to attract new customers to the Debtors' stores. Customer programs are standard in the retail food business. Without the ability to continue their Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing market share and value of their businesses. The Debtors' Customer Programs are described more fully in the Customer Programs Motion, and include (i) Return and Exchange Policies, (ii) Sales Promotions, (iii) Coupons, (iv) Gift Card Programs, (v) the Prescription Drug Program, (vi) State Lotteries, (vii) the Bottle Deposit Program, (viii) the Check Cashing Program, (ix) Reward Card Programs, and (x) Charitable Donations.

115.    In order to maintain the Debtors' reputation for reliability and to maintain the loyalty, goodwill and support of their Customers, the Debtors must maintain their Customer Programs and honor their obligations thereunder. The Customer Programs are also essential

WEIL:\96457936\1\77738.0003

marketing strategies for attracting new customers.     Failure to the provide the Customer Programs will place the Debtors at a significant – and potentially insurmountable – comparative disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from these chapter 11 filings.

(vii)     Motion of Debtors for Authorization to Pay Certain Prepetition Taxes and Fees ("**Taxes and Fees Motion**")

116.     The Debtors request authority, but not direction, the Debtors to remit and pay certain taxes, assessments, fees, and other charges in the ordinary course of business, including any taxes, assessments, fees, and charges subsequently determined upon audit, or otherwise, to be owed (collectively, the "**Taxes and Fees**").

117.     The Debtors collect, withhold and incur an assortment of Taxes and Fees that they remit periodically to various federal, state and local taxing, licensing, regulatory and other governmental authorities (collectively, the "**Authorities**").     Many of the Taxes and Fees collected prepetition are not property of the Debtors' estates but, rather, are held in trust for the Authorities.     The Debtors also seek to pay certain Taxes and Fees to, among other things, forestall Authorities from taking actions that may interfere with the Debtors' administration of their chapter 11 cases.     Such interference could include bringing personal liability actions against directors, officers and other key employees (whose full-time attention to the Debtors' chapter 11 cases is required to avoid business disruptions and to maximize recoveries to the Debtors' creditors), asserting liens on the Debtors' property or assessing penalties or significant interest on past-due taxes.     In addition, non-payment of the Taxes and Fees may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code.     Accordingly, I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their

46

creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses.

> (viii)   Motion of Debtors for Authority to (A) Pay Prepetition Claims Of Shippers and Miscellaneous Lien Claimants, (B) Confirm Administrative Expense Priority of Undisputed Commencement Date Orders and Satisfy Such Obligations in the Ordinary Course of Business and (C) Pay PACA/PASA Claims (the "**Lienholders' Motion**")

118.   The Debtors seek authority, but not direction, to pay (a) up to $600,000 in Shipping Charges, (b) up to $2.7 million in Miscellaneous Lien Claims and (c) certain amounts in connection with Commencement Date Orders to suppliers, and (d) the PACA/PASA Claims.

119.   Certain of the Debtors' Merchandise is delivered by third-party transporters (collectively, the "**Shippers**").   In the event that the Debtors fail to reimburse the Shippers for charges incurred in connection with the transport of the Merchandise, various state laws permit the Shippers to assert a statutory lien against the Merchandise in their possession that is the subject of any delinquent charges, securing such charges and potentially blocking the Debtors' access to the Merchandise.

120.   The Debtors also contract with a number of third parties (collectively, the "**Miscellaneous Lien Claimants**") to perform repairs and make improvements related to refrigeration equipment, electrical systems, plumbing, elevator and escalator systems and various types of food service equipment.   The Miscellaneous Lien Claimants could potentially assert liens, including mechanic's liens, artisan's liens and materialman's liens against the Debtors' property for amounts the Debtors owe to these third parties (collectively, the "**Miscellaneous Lien Claims**").   If the Debtors are unable to pay the Miscellaneous Lien Claims, they risk losing access to facilities and equipment that are critical to the continued operation of the Supermarkets.

121.    In addition, prior to the Commencement Date, and in the ordinary course of business, the Debtors ordered Merchandise that will not be delivered until on or after the Commencement Date (the "**Commencement Date Orders**").   To avoid becoming general unsecured creditors of the Debtors' estates with respect to related Merchandise, certain suppliers may refuse to ship or transport such Merchandise or may recall such shipments with respect to such Commencement Date Orders or refuse to delivery future orders unless the Debtors issue substitute purchase orders postpetition or pay for such Merchandise.   The Debtors therefore require the relief requested in the Lienholders' Motion to prevent any disruption to the Debtors' retail operations.

122.    In addition, prior to the Commencement Date, the Debtors purchased certain produce that they believe may qualify as "perishable agricultural commodities" under the under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et seq. ("**PACA**").   Similarly, certain of the Debtors' suppliers (the "**PASA Claimants**" and, together with the PACA Claimants, the "**PACA/PASA Claimants**") may be eligible to assert claims under the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 et seq. ("**PASA**"), which prescribes the conditions of operations for businesses dealing in livestock and poultry.   I am advised that under both PACA and PASA, eligible suppliers and their agents (the "**PACA/PASA Claimants**") are the beneficiaries of a statutory trust in certain of the buyer's applicable inventory and proceeds relating thereto, and assets of the respective statutory trusts are not property of the Debtors' estates.   The PACA/PASA Claimants may be eligible to assert potential claims under the respective statutes for outstanding payments on account of applicable merchandise, which claims are granted priority ahead of secured and unsecured creditors.

(ix)    Motion of Debtors to (I) Maintain Certain Trust Programs, (II) Release Certain Funds Held in Trust, and (III) Continue to

48

Perform and Honor Related Obligations (the "**Trust Funds Motion**")

123.   The Debtors request authority, but not direction, to continue to perform and honor obligations under programs or other arrangements requiring the Debtors to release certain funds held in trust for the benefit and on behalf of non-Debtor third parties (collectively, the "**Trust Fund Programs**").  The Debtors engage in various marketing and sales practices designed to offer a convenience to their customers, attract new customers, promote loyalty among the existing customer base, and producing alternative streams of income.  Such practices include selling lottery tickets, third-party retail gift cards and special event tickets, offering charitable donation opportunities, onsite money transfer services and bill payment services, and coin and bottle depository.  It is essential that the Debtors honor their obligations in connection with such services and arrangements to preserve reputational integrity and continue to attract existing and new customers of their stores.

124.   Not only do the Debtors earn commission or bonuses directly from their participation in the Trust Programs, but the Trust Programs also serve to attract customers to the Debtors' stores, resulting in increased revenues for the Debtors.  The payment of the Trust Funds is important to the Debtors' continued business operations, and the value of the Debtors' businesses could be significantly harmed if the Debtors are unable to continue to offer the Trust Programs, and may drive customers to the Debtors' competitors for access these programs and products.

(x)    Motion of the Debtors for an Interim Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests and Claims in the Debtors and Claiming a Worthless Stock Deduction (the "**NOLs Motion**")

125.   The Debtors seek to establish procedures to protect the potential value of the Debtors' consolidated net operating loss carryforwards ("**NOLs**") and other tax benefits

WEIL:\96457936\1\77738.0003

(collectively, the "**Tax Attributes**") for use in connection with the reorganization of the Debtors. The proposed procedures would impose certain restrictions and notification requirements with respect to (a) common stock of Tops MBO Corporation (such entity's common stock, the "**Tops Common Stock**"), and any options or similar rights (within the meaning of applicable Treasury Regulations) to acquire such stock or interest and (b) any claim (for income tax reporting purposes) of a worthless stock deduction under section 165(g) of Title 26 of the United States Code (the "**Tax Code**") with respect to Tops Common Stock by a majority stockholder.

126.    The Debtors possess certain Tax Attributes, including, as of the Commencement Date, estimated NOLs in excess of $95 million and tax credits in excess of $3 million.  The Tax Attributes are valuable assets. During the pendency of the chapter 11 cases the Debtors expect that they will recognize taxable income and gain (particularly in light of recent tax legislation which imposes a limitation on a taxpayer's ability to reduce its taxable income through the deduction of interest expense).   Absent any intervening limitations, the Tax Attributes could substantially reduce the Debtors' future U.S. federal income tax liability in respect of such amounts.  Any reduction in the Debtors' tax liability would enhance the Debtors' cash position for the benefit of all parties in interest.

127.    An ownership change, pursuant to section 382 of the Tax Code (which is described further in the NOL Motion), prior to the effective date of a chapter 11 plan could effectively eliminate the Debtors' ability to use their Tax Attributes, thereby resulting in a significant loss of potential value to the Debtors' estates.  Accordingly, the trading procedures seek authority to restrict trading of Tops Common Stock and any claim of a worthless stock deduction that could result in an ownership change occurring *before* the effective date of a

WEIL:\96457936\1\77738.0003

chapter 11 plan or any applicable bankruptcy court order.  Such a restriction would protect the

Debtors' ability to use the Tax Attributes during the pendency of these chapter 11 cases.

> (xi)    Motion of Debtors Requesting Entry of an Order (I) Approving
> Debtors' Proposed Form of Adequate Assurance of Payment to
> Utility Providers, (II) Establishing Procedures for Determining
> Adequate Assurance of Payment for Future Utility Services, and
> (III) Prohibiting Utility Providers from Altering, Refusing, or
> Discontinuing Service (the "**Utilities Motion**")

128.    The Debtors request entry of an order (i) approving the Debtors' proposed

form of adequate assurance of payment to utility providers, (ii) establishing procedures for

determining adequate assurance of payment for future utility services, and (iii) prohibiting utility

providers from altering or discontinuing utility service on account of outstanding prepetition

invoices.

129.    Preserving utility services on an uninterrupted basis is essential to the

Debtors' ongoing operations and restructuring process.  Indeed, any interruption in utility

services—even for a brief period—would seriously disrupt the Debtors' ability to continue

operations and service their customers.  This disruption would adversely impact customer

relationships and would result in a decline in the Debtors' revenues.  It also would affect the

value of inventory—particularly items like perishable goods and frozen food.  Such a result

could seriously jeopardize the Debtors' restructuring efforts and, ultimately, creditor recoveries.

Therefore, it is critical that utility services continue uninterrupted during these chapter 11 cases.

130.    The Debtors intend to pay postpetition obligations owed to the Utility

Providers in a timely manner.  The Debtors expect that cash flows from operations and their DIP

Financing will be sufficient to pay postpetition obligations related to their utility services in the

ordinary course of business.

131.    Furthermore, the Debtors propose to deposit into a segregated, interest-bearing bank account a sum equal to the cost of two weeks' worth of the average utility cost for each Utility Provider (less any amounts already on deposit with any such Utility Provider that have not been applied to outstanding prepetition amounts),[13] based on the Debtors' average usage for the fiscal year ending 2017 (collectively, the "**Adequate Assurance Deposit**").

132.    I believe that the Adequate Assurance Deposit, in conjunction with the DIP Financing, cash flow from operations, and cash on hand demonstrate the Debtors' ability to pay for future utility services in the ordinary course of business and constitute sufficient adequate assurance to the Utility Providers.

(xii)    Motion of Debtors for Authorization to Continue Payment of Franchise Obligations and to Honor Franchise Arrangements in the Ordinary Course of Business (the "**Franchise Motion**")

133.    The Debtors request authority, but not direction to continue to honor, renew, or replace the Franchise Arrangements in the ordinary course of business, without further application to the Court, including to pay the Franchise Obligations (whether arising before or after the Commencement Date).

134.    The Franchise Arrangements are very profitable for the Debtors.  As a general matter, the Franchisees pay for their own goods and services purchased through the Debtors and are charged commissions or fees by the Debtors on a regular basis.  I believe that is a sound business decision to continue such profitable business arrangements.  Interrupting the ordinary course transactions involved in the Franchise Arrangements could disrupt and jeopardize the benefits realized by the Debtors from the Franchise Arrangements.  In addition, if the Debtors are not able to continue to honor and pay the Franchise Obligations, they may be in

---

[13] To the extent any deposits with any Utility Provider is in excess of two weeks' worth of the average utility cost, the Debtors reserve their right to demand such excess amounts.

WEIL:\96457936\1\77738.0003

breach of the Franchise Agreements and would likely create harm to the Franchisees' businesses, which in turn could have an adverse impact on the Debtors' brand.  Accordingly, in the exercise of their sound judgment, the Debtors believe that a sound business purpose exists for the relief requested herein because it will pay dividends with respect to the value of the Debtors' business, both in terms of profitability and the engendering of Franchisee goodwill, especially at this critical time for the company.

135.    I believe that the assurance to the Franchisees that all Franchise Obligations will be honored on an uninterrupted basis is crucial to their ongoing business operations and goodwill.  Similarly, maintenance of the Services will further the same goals and serve to preserve long-standing relationships, promote the Debtors' competitive position in the marketplace, and ultimately enhance revenue and profitability.   While the Debtors expend approximately $10 million to $12 million per month pursuant to the Franchise Obligations, such amounts are reimbursed in full by the Franchisees.   Currently, the Debtors already have $5 million reflected in the Code Account, which reflects amounts collected from and due to the Franchisees, for goods and services provided by the Debtors on their behalf.  Any additional costs allocable to the Franchisees will be paid by the Franchisees in the ordinary course.  The aggregate cost to the Debtors to honor and continue the Franchise Arrangements does not outweigh the irreparable harm and detrimental impact on their businesses that will be suffered if these arrangements are abandoned, namely, the loss of yearly net income of approximately $2.6 million, and the damage to the Debtors' brand and their long-standing relationships with the Franchisees.

(xiii)    Application of Debtors for Authority to Retain and Employ Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent *Nunc Pro Tunc* to the Commencement Date (the "**Claims and Noticing Agent Retention Application**")

WEIL:\96457936\1\77738.0003

136.   The Debtors request authority to appoint Epiq Bankruptcy Solutions, LLC ("**Epiq**") as claims and noticing agent ("**Claims and Noticing Agent**") in accordance with the terms and conditions of that certain Standard Services Agreement dated February 8, 2018, by and between the Company and Epiq (the "**Engagement Agreement**"), effective *nunc pro tunc* to the Commencement Date.  Epiq's duties will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these Chapter 11 Cases.  I believe the Debtors' selection of Epiq to serve as their Claims and Noticing Agent has satisfied the Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c).  Specifically, the Debtors have solicited and reviewed engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.

137.   I believe that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.  The terms of Epiq's retention are set forth in the Engagement Agreement attached to, and filed contemporaneously therewith, the Claims and Noticing Agent Retention Application.  Appointing Epiq as their Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing an overwhelming number of claims.

## VI.   Information Required by Local Rule 1007-2

138.   In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

139.   Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the

Commencement Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

140.    Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' forty (40) largest unsecured claims on a consolidated basis, excluding claims of insiders.

141.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the four (4) largest secured claims against the Debtors on a consolidated basis.

142.    Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors and their non-Debtor affiliates.

143.    Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

144.    Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

145.    Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

WEIL:\96457936\1\77738.0003

146.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

147.     Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

148.     Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

149.     Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' Chapter 11 Cases as the Debtors intend to continue to operate their businesses.

150.     Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

WEIL:\96457936\1\77738.0003

## Conclusion

151.    This declaration illustrates the factors that have precipitated the commencement of the Chapter 11 Cases and the critical need for the Debtors to implement their restructuring.

152.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

*[Remainder of Page Intentionally Left Blank]*

Executed this 21st day of February, 2018

/s/ Michael Buenzow
Michael Buenzow
Chief Restructuring Officer
Debtors and Debtors-in-Possession

WEIL:\96457936\1\77738.0003

## Schedule 1

### Committees

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, no official committee has been organized prior to the Commencement Date.

Pursuant to Local Rule 1007-2(a)(3), prior to the Commencement Date, the Debtors are aware of the following unofficial ad hoc group that was formed to engage with the Debtors in an effort to participate in the Debtors' ongoing restructuring efforts.

| Committee Description | Committee Representatives |
| --- | --- |
| Ad Hoc Committee of Holders of Senior Secured Notes due 2022 | Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, NY 10019-6064<br><br>(Attn: Alan W. Kornberg, Esq. and Lauren Shumejda, Esq.) |

## Schedule 2

**Consolidated List of 20 Largest Unsecured Claims (Excluding Insiders)[1]**

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of February 20, 2018, the twenty (20) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101(31).

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim |
|---|---|---|---|---|
| 1 | U.S. Bank National Association | Thompson Hine LLP<br>335 Madison Avenue, 12th Floor<br>New York, NY 10017-4611<br><br>Attn: Elizabeth Frayer<br>(212) 908-3973<br>Elizabeth.Frayer@ThompsonHine.com | 9.00% Notes due 2021 | $70,734,650 |
| 2 | C&S Wholesale Grocers | Landis Rath & Cobb LLP<br>919 Market Street<br>Wilmington, DE 19801<br><br>Attn: Richard S. Cobb<br>(302) 467-4430<br>cobb@lrclaw.com | Trade Debt | $54,718,870 |
| 3 | U.S. Bank National Association | Thompson Hine LLP<br>335 Madison Avenue, 12th Floor<br>New York, NY 10017-4611<br><br>Attn: Elizabeth Frayer<br>(212) 908-3973<br>Elizabeth.Frayer@ThompsonHine.com | 8.75% Notes due 2018 (HoldCo) | $8,748,058 |
| 4 | Topco | Topco<br>150 Northwest Point Boulevard<br>Elk Grove Village, IL 60007-1015<br><br>Attn: Andrew J. Broccolo<br>(847) 329-3360<br>abroccolo@topco.com | Trade Debt | $7,800,000 |
| 5 | UFCW Local One Health & Welfare Fund | Slevin & Hart, P.C.<br>1625 Massachusetts Ave. N.W.<br>Suite 450<br>Washington, DC 20036<br><br>Attn: Sharon M. Goodman<br>(202) 797-2205<br>sgoodman@slevinhart.com | Benefits | $3,080,400 |

---

[1]  The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim |
|---|---|---|---|---|
| 6 | Frito-Lay Inc. | Frito-Lay Inc. 7075 Samuel Morse Dr., Suite 240 Columbia, MD 21046<br><br>Attn: James Simms (410) 423-6601 James.simms@pepsico.com | Trade Debt | $2,952,006 |
| 7 | United Natural Foods | United Natural Foods P.O. Box 706 Keene, NH 03431<br><br>Attn: JJ Cantrell (864) 918-0097 jcatrell@unfi.com | Trade Debt | $2,530,309 |
| 8 | Coca-Cola | Coca-Cola Bottling Company of Northern New England, Inc. P.O. Box 419784 Boston, MA 02241-9784<br><br>Attn: Andy Marchesseault (603) 391-4887 amarchesseault@ccnne.com | Trade Debt | $2,353,543 |
| 9 | Pepsi | Pepsi Bottling Group Grocery, P.O. Box 75960 Chicago, IL 60675-5948<br><br>Attn: Bill Larrabee (518) 588-5948 William.larrabee@pepsi.com | Trade Debt | $1,957,627 |
| 10 | Upstate Niagara Cooperative, Inc. | Upstate Niagara Cooperative, Inc. 25 Anderson Road Buffalo, NY 14225<br><br>Attn: Mark A. Serling (585) 329-9436 mserling@upstateniagara.com<br><br>Pat Weed (716) 892-3156 x2562 pweed@upstateniagara.com | Trade Debt | $1,501,781 |
| 11 | Mondelez Global LLC | Mondelez Global LLC P.O. Box 70064 Chicago, IL 60673-0064<br><br>Attn: Angela Gray (412) 398-6624 Angela.gray@mdlz.com | Trade Debt | $1,454,995 |
| 12 | Sure Winner Foods | Sure Winner Foods 2 Lehner Road Saco, ME 04072<br><br>Attn: Paul Godin | Trade Debt | $1,371,652 |

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim |
|---|---|---|---|---|
| | | (207) 282-1258 x1255<br>Paul.godin@myswfoods.com | | |
| 13 | DXC Technology Services LLC | DXC Technology<br>1775 Tysons Blvd.<br>Tysons, VA 22102<br><br>Attn: William L. Deckelman Jr.<br>(703) 245-4585<br>wdeckelman@csc.com<br><br>Jim Lewis<br>(717) 773-5389<br>James.lewis5@dxc.com | Trade Debt | $1,094,383 |
| 14 | Stroehmann Bakeries, L.C. | Stroehmann Bakeries, L.C.<br>P.O. Box 644254<br>Pittsburgh, PA 15264-4254<br><br>Attn: Keith Smith<br>(704) 756-6552<br>ksmith@bbumail.com | Trade Debt | $1,084,190 |
| 15 | Wright Beverage Distributing | Wright Beverage Distributing<br>3165 Brighton Henrietta, Town Line Road<br>Rochester, NY 14623<br><br>Attn: Jeri Rippon<br>(585) 424-9613<br>jrippon@wrightbev.com | Trade Debt | $1,066,346 |
| 16 | Kreher's Farm Fresh Eggs LLC | Kreher's Farm Fresh Eggs LLC<br>5411 Davison Road<br>P.O. Box 410<br>Clarence, NY  14031-0410<br><br>Attn: Jamey Payne<br>(716) 759-6802<br>jameypayne@krehereggs.net | Trade Debt | $875,565 |
| 17 | Supermarket Management | Duke, Holzman, Photiadis & Gresens LLP<br>701 Seneca Street, Suite 750<br>Buffalo, NY 14210<br><br>Attn: Robert Bencini<br>(716) 855-1111<br>rbencini@dhpglaw.com | Contract | Unliquidated |
| 18 | Anthony Dimino | Phillips Lytle LLP<br>One Canalside<br>125 Main Street<br>Buffalo, NY 14203-2887<br><br>Attn: David J. Murray<br>(716) 847-5453<br>DMurray@phillipslytle.com | Contract | Unliquidated |

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim |
|-----|----------|------------------------------------------------------------------------------------------|---------------------|-----------------|
| 19 | UFCW Local One Pension Fund | Slevin & Hart, P.C.<br>1625 Massachusetts Ave. N.W.<br>Suite 450<br>Washington, DC 20036<br><br>Attn: Sharon M. Goodman<br>(202) 797-2205<br>sgoodman@slevinhart.com | Benefits | Unliquidated |
| 20 | NYS Teamsters Conference Pension & Retirement Fund | Groom Law Firm<br>1701 Pennsylvania Ave. N.W.<br>Washington DC 20006<br><br>Attn: Mark Nielsen<br>(202) 861-5429<br>mnielsen@groom.com | Benefits | Unliquidated |

## Schedule 3

### Consolidated List of Holders of Four Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the creditors holding, as of the Commencement Date, the four (4) largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101(31).

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Amount of Claim | Type of Collateral | Estimated Value of Collateral | Whether Claim or Lien is Disputed |
|---|---|---|---|---|---|---|
| 1. | 8.00% Notes due 2022 (OpCo) (U.S. Bank National Association) | Elizabeth Frayer Counsel, Thompson Hine LLP<br><br>335 Madison Avenue, 12th Floor New York, New York 10017-4611<br><br>212-908-3973 (D) 212-344-6101 (F) Elizabeth.Frayer@ThompsonHine.com | $568,088,889 | Various | Unknown | N/A |
| 2. | ABL Facility (including FILO Loan) (Bank of America, N.A.) | Marjorie S. Crider Partner, Morgan Lewis<br><br>One Federal St. Boston, MA 02110-1726<br><br>617-341-7789 (D) 617-341-7701 (F) marjorie.crider@morganlewis.com | $112,200,000 | Various | Unknown | N/A |
| 3. | Envipco Machines (Envipco) | Bill Donnelly Envipco<br><br>Environmental Products Corporation, Inc. 99 Great Hill Road Naugatuck, CT 06770<br><br>203-437-1350 (D) billd@envipco.com | $2,970,392 | Equipment | Unknown | N/A |
| 4. | Vehicles (LeasePlan USA) | Judy Jackman LeasePlan USA<br><br>1165 Sanctuary Parkway Alpharetta, GA 30009<br><br>440-838-0500 (D) judy.jackman@leaseplan.com | $2,193,833 | Vehicles | Unknown | N/A |

## Schedule 4

**Tops - Condensed Consolidated Balance Sheet (Unaudited)**

**As of December 30, 2017**

**Assets**

Current assets

| | | |
|---|---:|---:|
| Cash and cash equivalents | $ | 18,234 |
| Accounts receivable, net | | 78,376 |
| Inventory, net | | 156,750 |
| Prepaid expenses and other current assets | | 12,262 |
| Total current assets | | 265,622 |
| Property and equipment, net | | 306,032 |
| Goodwill | | 219,886 |
| Intangible assets, net | | 159,002 |
| Other Assets | | 26,944 |
| Total assets | $ | 977,486 |

**Liabilities and Shareholders' Deficit**

Current liabilities

| | | |
|---|---:|---:|
| Accounts payable | $ | 76,804 |
| Accrued expenses and other current liabilities | | 102,366 |
| Current portion of capital lease obligations | | 7,509 |
| Current portion of long-term debt | | 22,594 |
| Total current liabilities | | 209,273 |
| Capital lease obligations | | 147,906 |
| Long-term debt | | 701,000 |
| Other long-term liabilities | | 71,068 |
| Non-current deferred tax liability | | 46,961 |
| Total liabilities | | 1,176,208 |
| Shareholders' deficit | | |
| Treasury stock | | (1) |
| Paid-in capital | | 6,165 |
| Accumulated deficit | | (203,410) |
| Accumulated other comprehensive income, net of tax | | (1,476) |
| Total shareholders' deficit | | (198,722) |
| | | |
| Total liabilities and shareholders' deficit | $ | 977,486 |

## Schedule 5

### Publicly Held Securities

Pursuant to Local Rule 1007-2(a)(7), no securities of any of the Debtors are publicly held. The securities held by the Debtors' directors and officers are listed separately below.

### Tops MBO Corporation Common Stock Held by the Debtors' Executive Officers

| Name of Officer/Director | Approximate Number of Shares | As of |
|---|---|---|
| Frank Curci | 59,581 | September 1, 2017 |
| John Persons | 22,663 | September 1, 2017 |
| Jack Barrett | 8,240 | September 1, 2017 |
| David Langless | 1,125 | September 1, 2017 |
| Ron Ferri | 1,125 | September 1, 2017 |

### Tops MBO Corporation Common Stock Held by the Debtors' Non-Officer Directors

| Name of Non-Officer Director | Approximate Number of Shares | As of |
|---|---|---|
| Lynne Burgess | 1,903 | September 1, 2017 |

### Tops Holding II Corporation Common Stock Held by the Debtors' Executive Officers

| Name of Officer/Director | Approximate Number of Shares | As of |
|---|---|---|
| Frank Curci | 1 | September 1, 2017 |
| John Persons | 1 | September 1, 2017 |
| Jack Barrett | 1 | September 1, 2017 |

**Tops Holding II Corporation Common Stock Held by the Debtors' Non-Officer Directors**

| Name of Non-Officer Director | Approximate Number of Shares | As of |
|---|---|---|
| Lynne Burgess | 1 | September 1, 2017 |

## Schedule 6

### Debtors' Property Not in the Debtors' Possession

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including vendors, shippers, common carriers, materialmen, distributors, warehousemen, fulfillment houses, service providers, custodians, public officers, or agents, where the Debtors' ownership interest is not affected. Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## Schedule 7

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

### Leased Property[2]

| Debtor | Street Address | City | State | Zip Code | Country |
|--------|---------------|------|-------|----------|---------|
| Tops Markets, LLC | 1000 Portage | Niagara Falls | NY | 14301 | U.S.A. |
| Tops Markets, LLC | 7200 Niagara Falls Blvd | Niagara Falls | NY | 14304 | U.S.A. |
| Tops Markets, LLC | 2956 Saunders Settlement Road | Sanborn | NY | 14132 | U.S.A. |
| Tops Markets, LLC | 3949 Lockport & Olcott | Lockport | NY | 14094 | U.S.A. |
| Tops Markets, LLC | 2555 Main Street | Newfane | NY | 14108 | U.S.A. |
| Tops Markets, LLC | 3980 Maple & N Bailey | Amherst | NY | 14226 | U.S.A. |
| Tops Markets, LLC | 3980 Maple & N Bailey | Amherst | NY | 14226 | U.S.A. |
| Tops Markets, LLC | 3500 Main & Kenmore | Amherst | NY | 14226 | U.S.A. |
| Tops Markets, LLC | 3870 Harlem Road | Cheektowaga | NY | 14215 | U.S.A. |
| Tops Markets, LLC | 355 Orchard Park & Slade | W Seneca | NY | 14224 | U.S.A. |
| Tops Markets, LLC | 315 Orchard Park Road | W Seneca | NY | 14224 | U.S.A. |
| Tops Markets, LLC | 211 N Winton Road | Rochester | NY | 14610 | U.S.A. |
| Tops Markets, LLC | 7375 Boston State Road | N Boston | NY | 14110 | U.S.A. |
| Tops Markets, LLC | 3201 Southwestern Blvd. | Orchard Park | NY | 14127 | U.S.A. |
| Tops Markets, LLC | 4050 N Buffalo Road | Orchard Park | NY | 14127 | U.S.A. |
| Tops Markets, LLC | 123 Grey | E Aurora | NY | 14052 | U.S.A. |
| Tops Markets, LLC | 2140 GIB & Whitehaven | Grand Island | NY | 14072 | U.S.A. |
| Tops Markets, LLC | 4235 Military Road | Town of Niagara | NY | 14305 | U.S.A. |

---

[2]   The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

| | | | | | |
|---|---|---|---|---|---|
| Tops Markets, LLC | 700 Harlem & Walden | Cheektowaga | NY | 14225 | U.S.A. |
| Tops Markets, LLC | 3865 Union | Cheektowaga | NY | 14225 | U.S.A. |
| Tops Markets, LLC | 2401 W State | Olean | NY | 14760 | U.S.A. |
| Tops Markets, LLC | 3035 Niagara Falls Blvd | Amherst | NY | 14228 | U.S.A. |
| Tops Markets, LLC | 2000 Washington | Jamestown | NY | 14701 | U.S.A. |
| Tops Markets, LLC | 345 Amherst | Buffalo | NY | 14207 | U.S.A. |
| Tops Markets, LLC | 800 Harlem & Mineral Springs | W Seneca | NY | 14224 | U.S.A. |
| Tops Markets, LLC | 1460 S Park | Buffalo | NY | 14220 | U.S.A. |
| Tops Markets, LLC | 4250 McKinley Pkwy | Hamburg | NY | 14075 | U.S.A. |
| Tops Markets, LLC | 4777 Transit | Depew | NY | 14043 | U.S.A. |
| Tops Markets, LLC | 1770 Broadway | Buffalo | NY | 14212 | U.S.A. |
| Tops Markets, LLC | 2351 Maple & Transit | Amherst | NY | 14221 | U.S.A. |
| Tops Markets, LLC | 2351 Maple & Transit | Amherst | NY | 14221 | U.S.A. |
| Tops Markets, LLC | 890 Young St. | Tonawanda | NY | 14150 | U.S.A. |
| Tops Markets, LLC | 9660 Transit | E Amherst | NY | 14051 | U.S.A. |
| Tops Markets, LLC | 150 Niagara | Tonawanda | NY | 14150 | U.S.A. |
| Tops Markets, LLC | 2101 Elmwood | Buffalo | NY | 14207 | U.S.A. |
| Tops Markets, LLC | 184 South Cascade | Springville | NY | 14141 | U.S.A. |
| Tops Markets, LLC | 6150 S Park & Clark | Hamburg | NY | 14075 | U.S.A. |
| Tops Markets, LLC | 6363 Transit | Depew | NY | 14043 | U.S.A. |
| Tops Markets, LLC | 658 W Main | Arcade | NY | 14009 | U.S.A. |
| Tops Markets, LLC | Delaware & Sheridan | Tonawanda | NY | 14150 | U.S.A. |
| Tops Markets, LLC | 301 Meadow Drive | N Tonawanda | NY | 14120 | U.S.A. |

| | | | | | |
|---|---|---|---|---|---|
| Tops Markets, LLC | 390 W Main | Batavia | NY | 14020 | U.S.A. |
| Tops Markets, LLC | 128 W Main | Leroy | NY | 14482 | U.S.A. |
| Tops Markets, LLC | 2382 R19 | Warsaw | NY | 14569 | U.S.A. |
| Tops Markets, LLC | 11200 Maple Ridge | Medina | NY | 14103 | U.S.A. |
| Tops Markets, LLC | 111 Bolivar | Wellsville | NY | 14895 | U.S.A. |
| Tops Markets, LLC | 12775 Broadway | Alden | NY | 14004 | U.S.A. |
| Tops Markets, LLC | 9049 Erie Road | Angola | NY | 14006 | U.S.A. |
| Tops Markets, LLC | 3956 Vineyard Drive | Dunkirk | NY | 14048 | U.S.A. |
| Tops Markets, LLC | 6914 Erie Road | Derby | NY | 14047 | U.S.A. |
| Tops PT, LLC | 64 South Erie St. | Mayville | NY | 14757 | U.S.A. |
| Tops PT, LLC | 64 E. Washington St. | Ellicottville | NY | 14731 | U.S.A. |
| Tops PT, LLC | 110 South Work St. | Falconer | NY | 14733 | U.S.A. |
| Tops PT, LLC | 51 Main St., Randolph Plaza | Randolph | NY | 14772 | U.S.A. |
| Tops PT, LLC | 738 Foote Ave. | Jamestown | NY | 14701 | U.S.A. |
| Tops PT, LLC | 7134 Rochester Rd. | Lockport | NY | 14094 | U.S.A. |
| Tops PT, LLC | 5274 Main & Union | Williamsville | NY | 14221 | U.S.A. |
| Tops PT, LLC | 150 Prospect St. | Attica | NY | 14011 | U.S.A. |
| Tops PT, LLC | 140 Central Ave. | Silver Creek | NY | 14136 | U.S.A. |
| Tops PT, LLC | 121 E. Main St. | Westfield | NY | 14787 | U.S.A. |
| Tops PT, LLC | 2265 Downer St. | Baldwinsville | NY | 13027 | U.S.A. |
| Tops PT, LLC | 5335 W. Genesee St. | Camillus | NY | 13031 | U.S.A. |
| Tops PT, LLC | 900 W. Genesee St. | Chittenango | NY | 13037 | U.S.A. |
| Tops PT, LLC | Rt. 5 & Oxbow Road | Canastota | NY | 13032 | U.S.A. |

| | | | | | |
|---|---|---|---|---|---|
| Tops PT, LLC | 3803 Brewerton Rd. | N. Syracuse | NY | 13212 | U.S.A. |
| Tops PT, LLC | 620 Nottingham Rd. | Syracuse | NY | 13210 | U.S.A. |
| Tops PT, LLC | 87 E. State St. | Sherrill | NY | 13461 | U.S.A. |
| Tops PT, LLC | 119 W. Seneca St. | Manlius | NY | 13104 | U.S.A. |
| Tops PT, LLC | 40 Fennell St. | Skaneateles | NY | 13152 | U.S.A. |
| Tops PT, LLC | 85 Nelson Street | Cazenovia | NY | 13035 | U.S.A. |
| Tops PT, LLC | 63  Nelson Street | Cazenovia | NY | 13035 | U.S.A. |
| Tops PT, LLC | 8417 Oswego Rd. | Clay | NY | 13027 | U.S.A. |
| Tops PT, LLC | 181 Shop City Plaza | Syracuse | NY | 13206 | U.S.A. |
| Tops PT, LLC | 2120 W. Genesee St. | Syracuse | NY | 13219 | U.S.A. |
| Tops PT, LLC | 4410 E. Genesee St. | Dewitt | NY | 13214 | U.S.A. |
| Tops Markets, LLC | 4141 S Salina Street | Syracuse | NY | 13205 | U.S.A. |
| Tops Markets, LLC | 700 First North Street | Syracuse | NY | 13208 | U.S.A. |
| Tops Markets, LLC | 227 E Main Street | Elbridge | NY | 13060 | U.S.A. |
| Tops Markets, LLC | 9 Mechanics Street | Jordan | NY | 13080 | U.S.A. |
| Tops Markets, LLC | 710 Lake | Rochester | NY | 14613 | U.S.A. |
| Tops Markets, LLC | 450 West Avenue | Rochester | NY | 14611 | U.S.A. |
| Tops Markets, LLC | 2345 Buffalo & Pixley | Gates | NY | 14624 | U.S.A. |
| Tops Markets, LLC | 175 Winton | Rochester | NY | 14610 | U.S.A. |
| Tops Markets, LLC | 1900 Clinton S | Brighton | NY | 14618 | U.S.A. |
| Tops Markets, LLC | 6272 Furnace | Ontario | NY | 14519 | U.S.A. |
| Tops Markets, LLC | 1215 Jefferson Road | Henriettta | NY | 14623 | U.S.A. |
| Tops Markets, LLC | 1601 Penfield | Rochester | NY | 14625 | U.S.A. |

| | | | | | |
|---|---|---|---|---|---|
| Tops Markets, LLC | 3507 Mt Read & Maiden | Greece | NY | 14616 | U.S.A. |
| Tops Markets, LLC | 6720 Pittsford & Palmyra | Fairport | NY | 14450 | U.S.A. |
| Tops Markets, LLC | 2140 Walworth/Penfield Road | Walworth | NY | 14568 | U.S.A. |
| Tops Markets, LLC | 999 East Ridge Road | Rochester | NY | 14621 | U.S.A. |
| Tops Markets, LLC | 270 E Main | Avon | NY | 14414 | U.S.A. |
| Tops Markets, LLC | Rt 332 & North Street | Canandaigua | NY | 14424 | U.S.A. |
| Tops Markets, LLC | 76 Kendall Street | Clifton Springs | NY | 14432 | U.S.A. |
| Tops Markets, LLC | 33 Forgham Street | Lyons | NY | 14489 | U.S.A. |
| Tops Markets, LLC | 6179 NY 96 | Farmington | NY | 14425 | U.S.A. |
| Tops Markets, LLC | 381 Hamilton Street | Geneva | NY | 14456 | U.S.A. |
| Tops Markets, LLC | 381 Hamilton Street | Geneva | NY | 14456 | U.S.A. |
| Tops Markets, LLC | 1800 Lake | Hamlin | NY | 14464 | U.S.A. |
| Tops Markets, LLC | 408 West Ave | Albion | NY | 14411 | U.S.A. |
| Tops Markets, LLC | 98 South Avenue | Hilton | NY | 14468 | U.S.A. |
| Tops Markets, LLC | 27 Slayton Ave | Spencerport | NY | 14554 | U.S.A. |
| Tops Markets, LLC | 285 Upper Falls Blvd | Rochester | NY | 14605 | U.S.A. |
| Tops Markets, LLC | 352 W Genesee | Auburn | NY | 13021 | U.S.A. |
| Tops Markets, LLC | 909 W First Street | Fulton | NY | 13069 | U.S.A. |
| Tops Markets, LLC | 3918 SR281 | Cortland | NY | 13045 | U.S.A. |
| Tops Markets, LLC | 35 Franklin Plaza | Dansville | NY | 14437 | U.S.A. |
| Tops Markets, LLC | 2300 Triphammer | Lansing | NY | 14850 | U.S.A. |
| Tops Markets, LLC | 710 S Meadow Street | Ithaca | NY | 14850 | U.S.A. |
| Tops Markets, LLC | 6726 Route 9 | Rhinebeck | NY | 12572 | U.S.A. |

| | | | | | |
|---|---|---|---|---|---|
| Tops Markets, LLC | 271 Main Street | New Paltz | NY | 12561 | U.S.A. |
| Tops Markets, LLC | 16 Jon J Wagner Way | Lagrange | NY | 12540 | U.S.A. |
| Tops Markets, LLC | 13547 Route 9 | Wappinger Falls | NY | 12590 | U.S.A. |
| Tops Markets, LLC | 1936 US Route 6 | Carmel | NY | 10512 | U.S.A. |
| Tops Markets, LLC | 372 Timpany Boulevard | Gardner | MA | 01440 | U.S.A. |
| Tops Markets, LLC | 309 W Morris | Bath | NY | 14810 | U.S.A. |
| Tops Markets, LLC | 360 W Pulteney Street | Corning | NY | 14830 | U.S.A. |
| Tops Markets, LLC | 830 Consumer Sq Plaza & Rt64 | Elmira | NY | 14903 | U.S.A. |
| Tops Markets, LLC | 299 S. Main | Elmira | NY | 14904 | U.S.A. |
| Tops PT, LLC | 1963 Kingdom Plaza | Waterloo | NY | 13165 | U.S.A. |
| Tops PT, LLC | 321 Liberty St. | Penn Yan | NY | 14527 | U.S.A. |
| Tops PT, LLC | 22-28 Maiden/315 Liberty St. (Parking Lot) | Penn Yan | NY | 14527 | U.S.A. |
| Tops PT, LLC | 160 Main Street | Penn Yan | NY | 14527 | U.S.A. |
| Tops PT, LLC | 5 Commons Drive, Rt. 28 | Cooperstown | NY | 13326 | U.S.A. |
| Tops PT, LLC | 54 E. Main St. | Norwich | NY | 13815 | U.S.A. |
| Tops PT, LLC | 7395 Turin Road | Lowville | NY | 13367 | U.S.A. |
| Tops PT, LLC | 504 S. Franklin St. | Watkins Glen | NY | 14891 | U.S.A. |
| Tops PT, LLC | 1600 Cedar St., Southtown Plz | Elmira | NY | 14904 | U.S.A. |
| Tops PT, LLC | 1145 Rt. 17-C | Owego | NY | 13827 | U.S.A. |
| Tops PT, LLC | 3830 Rome Road | Pulaski | NY | 13142 | U.S.A. |
| Tops PT, LLC | 9554 State Rt. 13 | Camden | NY | 13316 | U.S.A. |
| Tops PT, LLC | 217 Erie Blvd. West | Rome | NY | 13440 | U.S.A. |
| Tops PT, LLC | Route 11 Seaway S. C. | Watertown | NY | 13601 | U.S.A. |

| | | | | | |
|---|---|---|---|---|---|
| Tops PT, LLC | 3385 Main Street | Mexico | NY | 13114 | U.S.A. |
| Tops PT, LLC | 6103 North Main Street | Sandy Creek | NY | 13145 | U.S.A. |
| Tops PT, LLC | 6103 North Main Street | Sandy Creek | NY | 13145 | U.S.A. |
| Tops PT, LLC | 109169 US Rt 11 | Adams | NY | 13605 | U.S.A. |
| Tops PT, LLC | 1330 Washington St | Watertown | NY | 13601 | U.S.A. |
| Tops PT, LLC | 261 Utica Blvd | Boonville | NY | 13309 | U.S.A. |
| Tops Markets, LLC | 409 Fulton Street | Hannibal | NY | 13074 | U.S.A. |
| Tops Markets, LLC | 1702 E 38th | Erie | PA | 16510 | U.S.A. |
| Tops Markets, LLC | 1520 W 26th & Green Garden | Erie | PA | 16508 | U.S.A. |
| Tops Markets, LLC | 74 Market Street | Warren | PA | 16365 | U.S.A. |
| Tops Markets, LLC | 14 S Davis | Bradford | PA | 16701 | U.S.A. |
| Tops Markets, LLC | 198 West Main Street | Westfield | PA | 16950 | U.S.A. |
| Tops Markets, LLC | 1006 N Elmira | Sayre | PA | 18840 | U.S.A. |
| Tops PT, LLC | 712 W. 38th St., Liberty Plaza | Erie | PA | 16508 | U.S.A. |
| Tops Markets, LLC | 230 S. High St., PO Box 327 | Waterford | PA | 16441 | U.S.A. |
| Tops PT, LLC | 144 Center St. Downtown Mall | Meadville | PA | 16335 | U.S.A. |
| Tops PT, LLC | 525 North Fraley St. | Kane | PA | 16735 | U.S.A. |
| Tops PT, LLC | 11 Main Street | Wellsboro | PA | 16901 | U.S.A. |
| Tops PT, LLC | 595 Elmira St. | Troy | PA | 16947 | U.S.A. |
| Tops PT, LLC | East Main St., RD#1 | Canton | PA | 17724 | U.S.A. |
| Tops Markets, LLC | Bradford Towne Ctr., RR 6035 | Towanda | PA | 18848 | U.S.A. |
| Tops Markets, LLC | 100 Main Street | Corinth | NY | 12822 | U.S.A. |
| Tops Markets, LLC | 3836 Main Street | Warrensburg | NY | 12885 | U.S.A. |

| Tops Markets, LLC | 6 Sagamore Road | Bolton Landing | NY | 12814 | U.S.A. |
| Tops Markets, LLC | 156 Church Street | Saranac Lake | NY | 12983 | U.S.A. |
| Tops Markets, LLC | 622 Lake Flower Ave | Saranac Lake | NY | 12983 | U.S.A. |
| Tops Markets, LLC | 7544 Court Street | Elizabethtown | NY | 12932 | U.S.A. |
| Tops Markets, LLC | 6308 NYS Highway 9 | Chestertwown | NY | 12817 | U.S.A. |
| Tops Markets, LLC | 50 S Main Street | Peru | NY | 12853 | U.S.A. |
| Tops Markets, LLC | 4669 Main Street | North Creek | NY | 12912 | U.S.A. |
| Tops Markets, LLC | 24 Main Street | Ausable Forks | NY | 12912 | U.S.A. |
| Tops Markets, LLC | 1103 US Route 9 | Schroon Lake | NY | 12870 | U.S.A. |
| Tops Markets, LLC | Country Square & Route 32 | Greenville | NY | 12083 | U.S.A. |
| Tops Markets, LLC | Main Street | Northville | NY | 12134 | U.S.A. |
| Tops Markets, LLC | 127 Main Street | Stamford | NY | 12167 | U.S.A. |
| Tops Markets, LLC | 252 NYS Route 22 | Hoosick Falls | NY | 12090 | U.S.A. |
| Tops Markets, LLC | 7410 Route 9W | Coxsackie | NY | 12192 | U.S.A. |
| Tops Markets, LLC | Route 23 Main Street | Tannersville | NY | 12485 | U.S.A. |
| Tops Markets, LLC | 8 West Main Street | Hancock | NY | 13783 | U.S.A. |
| Tops Markets, LLC | 8 West Main Street | Hancock | NY | 13783 | U.S.A. |
| Tops Markets, LLC | Norton Place & Main St | Rutland | VT | 05701 | U.S.A. |
| Tops Markets, LLC | 101 North Main Street | Northfield | VT | 05663 | U.S.A. |
| Tops Markets, LLC | 82VT Route 15 W | Hardwick | VT | 05843 | U.S.A. |

## Owned Property

| Debtor | Street Address | City | State | Zip Code | Country |
| --- | --- | --- | --- | --- | --- |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | 803 Elmwood Avenue | Niagara Falls | NY | 14303 | U.S.A. |

| | | | | | |
|---|---|---|---|---|---|
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | 155 Meyer Road | Amherst | NY | 14226 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | Dick Road (rail road tracks) | Cheektowaga | NY | 14225 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | 1424 South Park Avenue | Buffalo | NY | 14220 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | 1426 South Park Avenue | Buffalo | NY | 14220 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | 1428 South Park Avenue | Buffalo | NY | 14220 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | 4266 Clark Street | Hamburg | NY | 14075 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | 396 West Main Street | Batavia | NY | 14020 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | Mallery Street | Corinth | NY | 12822 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | 5873 Genesee Street | Lancaster | NY | 14086 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | 2062 Genesee Street | Buffalo | NY | 14211 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | Orchard Park Road | West Seneca | NY | 14224 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | Abbott Road | North Boston | NY | 14110 | U.S.A. |
| Tops Markets, Inc. (predecessor of Tops Markets, LLC) | Taylor Drive | Depew | NY | 14043 | U.S.A. |
| Tops PT, LLC | Woodworth Avenue | Ellicott | NY | 14701 | U.S.A. |
| Tops Markets, LLC | 4600 East Genesee Street | Dewitt | NY | 13214 | U.S.A. |
| Tops Markets, LLC | 1275 Jefferson Avenue | Buffalo | NY | 14208 | U.S.A. |
| Tops PT, LLC | 5351 N Burdick Road | Fayetteville | NY | 13066 | U.S.A. |
| Tops PT, LLC | 4410 E Genesee Street | Dewitt | NY | 13214 | U.S.A. |
| Tops PT, LLC | 19-21 East High Street | Union City | PA | 16438 | U.S.A. |
| Tops PT, LLC | 28 Railroad Avenue | Youngstown | PA | 16371 | U.S.A. |
| Tops PT, LLC | 9 Leather Street | Sheffield | PA | 16347 | U.S.A. |
| Tops PT, LLC | 20 Center Street | Frewsburg | NY | 14738 | U.S.A. |

## Schedule 8

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As of December 30, 2017, the Debtors had assets of more than $900 million, as provided in Schedule 4, with substantial assets in New York, Pennsylvania, and Vermont.

### Books and Records

The Debtors' books and records are located at 6363 Main Street, Williamsville, NY 14221-5855.

### Debtors' Assets Outside the United States

The Debtors do not have significant assets located outside of the territorial limits of the United States.

**Schedule 9**

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Commencement Date, where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name & Position | Responsibilities & Experience |
| --- | --- |
| Frank Curci – Chairmen & Chief Executive Officer | Frank Curci has served as Chairman and Chief Executive officer of the Debtors since 2007.  Mr. Curci served as the Chief Executive Officer of Tops from 2000 to 2003, when Tops was owned by Ahold.  Prior to joining Tops in 2007, Mr. Curci held senior leadership positions at BI-LO, LLC, a former Ahold subsidiary, and Edward Super Food Stores.  Previously, from April 2005 to September 2006, Mr. Curci served as Chief Operating Officer of Southern Family Markets.  Mr. Curci earned a Bachelor's of Arts and a Master in Business Administration from Rutgers University. |
| David Langless – Executive Vice President, Chief Financial Officer, & Director | David Langless joined Tops as Director of Financial Reporting in 2008 and, in 2010, was promoted to Vice President and Chief Accounting Officer.  In October 2014, Mr. Langless was named Senior Vice President and Chief Financial Officer.  In 2015, he was appointed to his current position.  Prior to joining Tops, Mr. Langless served as Director of Financial Reporting at Mark IV Industries and, prior to that, worked at Ernst & Young, LLP. Mr. Langless also has experience with Ernst & Young, LLP.  Mr. Langless earned a Bachelor's in Science from Canisius College and a Master in Business Administration from the State of New York at Buffalo.  Mr. Langless is also a Certified Public Accountant. |
| John Persons – President and Chief Operating Officer | John Persons has served at Tops for over 33 years.  Mr. Persons was promoted to his current role in October 2015.  Prior to that, Mr. Persons served as the Vice President of Retail Operations from 2000 to 2007, as Senior Vice President of Retail Operations from 2007 to 2014, and as Executive Vice President of Sales and Marketing and Merchandising from January 2015 to October 2015.  Mr. Persons earned a Bachelor's of Arty and a Masters of Business Administration from the State University of New York at Buffalo. |

| Name & Position | Responsibilities & Experience |
|---|---|
| Jack Barrett – Executive Vice President, Human Resources, Assistant Secretary, & Director | Jack Barret has served at Tops for over 40 years.  Mr. Barrett was appointed to his current position in January 2015.  Prior to his current role, Mr. Barret served as Vice President of Labor Relations in 1987 and then as Vice President of Human Resources beginning in 1996.  Subsequently, Mr. Barrett served as the Senior Vice President of Human Resources and a member of the Tops Executive Committee from 2000 to 2014.  Mr. Barrett earned a Bachelor's of Science from Canisius College. |
| Ron Ferri – Executive Vice President, Operations & Distribution, Director | Ron Ferri has served at Tops for over 27 years.  Mr. Ferri was appointed to his current role in October 2015.  Prior to his current role, Mr. Ferri served as Regional Vice President of Distribution & Logistics from 2010 to 2013.  Mr. Ferri then served as Vice President of Distribution, before being named Senior Vice President of Distribution & Logistics in October 2014. |

WEIL:\96457940\1\77738.0003

## Schedule 11

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Weekly Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $6,000,000.00 |
| **Payments to Officers, Stockholders, and Directors** | $350,000.00 |
| **Payments to Financial and Business Consultants** | $1,500,000.00 |

## Schedule 12

### Cash Receipts and Disbursements,
### Net Cash Gain or Loss, Unpaid Obligations and Receivables

       Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $253,400,000.00 |
| **Cash Disbursements** | $272,200,000.00 |
| **Net Cash Loss** | $18,800,000.00 |
| **Unpaid Obligations** | $60,000,000.00 |
| **Uncollected Receivables** | N/A |